1

```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF CONNECTICUT

 3
    KARL HOGFELDT                  :
 4                                 :  NO.: 3:01CV1979(WWE)
    V.                             :
 5                                 :
    OLD SAYBROOK POLICE DEPARTMENT;  :  JULY 16, 2003
 6  SERGEANT DONALD HULL; PATROLMAN   :
    DAVID PERROTTI; PATROLMAN CHRIS   :
 7  DEMARCO; PATROLMAN JAY RANKIN;    :
    EACH INDIVIDUALLY AND AS POLICE   :
 8  OFFICERS AND MEMBERS OF THE OLD   :
    SAYBROOK POLICE DEPARTMENT; AND   :
 9  THE TOWN OF OLD SAYBROOK          :

10  --------------------------------------------------------
              DEPOSITION OF KARL HOGFELDT
11  --------------------------------------------------------

12

13  APPEARANCES:

14          SPINELLA & ASSOCIATES
                Attorneys for the Plaintiffs
15              One Lewis Street
                Hartford, Connecticut  06103
16              (860) 728-4900
            BY:  A. PAUL SPINELLA, ESQ.
17

18
            HOWD & LUDORF
19              Attorneys for the Defendants
                65 Wethersfield Avenue
20              Hartford, Connecticut  06114
                (860) 249-1361
21          BY:  THOMAS R. GERARDE, ESQ.

22
        NIZIANKIEWICZ & MILLER REPORTING SERVICES
23               972 Tolland Street
        East Hartford, Connecticut 06108-1533
24               (860) 291-9191

25              DONNA M. DECIANTIS, LSR
```

# Exhibit A

2

```
 1        Deposition of KARL HOGFELDT, taken on behalf of

 2   the defendants in the hereinbefore entitled action

 3   pursuant to the Federal Rule of Civil Procedure 30

 4   before Donna M. DeCiantis, duly qualified notary public

 5   in and for the State of Connecticut, held at the

 6   offices of Howd & Ludorf, 65 Wethersfield Avenue,

 7   Hartford, Connecticut, commencing at 11:17 a.m.,

 8   Wednesday, July 16, 2003.

 9                    S T I P U L A T I O N S

10        It is hereby stipulated and agreed by and

11   among counsel for the respective parties that all

12   formalities in connection with the taking of this

13   deposition, including time, place, sufficiency of

14   notice, and the authority of the officer before whom it

15   is being taken, may be and are hereby waived.

16        It is further stipulated and agreed that

17   objections other than as to form are reserved to the

18   time of trial.

19        It is further stipulated and agreed that the

20   reading and signing of the deposition are not waived.

21        It is further stipulated that the proof of

22   the qualifications of the notary public before whom the

23   deposition is being taken are hereby waived.

24

25
```

3

```
 1                    I N D E X

 2

 3  WITNESS

 4  KARL HOGFELDT

 5        Direct examination by Attorney Gerarde..........4

 6        Cross-examination by Attorney Spinella.........97

 7

 8

 9  ------------------------------------------------------

10                  INDEX OF EXHIBITS
                   (Marked for Identification)
11

12  DEFENDANTS' EXHIBITS

13  A     Photograph....................................73

14

15

16

17

18

19

20

21

22

23

24

25
```

1      A      It was just Doris.

2      Q      -- it's not to make you miserable.  I

3 apologize.  We're not talking about that anymore.

4      A      Okie doke.

5      Q      Why don't you -- what I'm interested in is I

6 know that you don't have a home now, but did you ever

7 have a home, like an address?

8      A      Yes.  53 Nod Road.

9      Q      53 Nod, N-o-d?

10      A      Yes.

11      Q      What town is that?

12      A      Clinton.

13      Q      How long did you live there for?

14      A      Six years.

15      Q      Is that the house that you say you sold?

16      A      Yes.  We sold that when Doris was dying of

17 cancer.

18      Q      So you would have been living at 53 Nod Road

19 on the day of the arrest in Old Saybrook, October '99?

20      A      No.  We sold that house.

21      Q      It had been sold by then?

22      A      Just six and a half, seven weeks previous.

23 That's why we were staying at that hotel, while we were

24 looking for a new apartment.

25      Q      I see.  So I know from reading the reports

21

1  that you and Sergeant Hull first met that night in the

2  parking lot of a hotel; is that right?  Is that where

3  he first pulled up to you and had you get out of the

4  car?

5      A    The night of the beating?

6      Q    Well, the night of your arrest, let's put it

7  that way.

8      A    Well, yes, in the hotel.

9      Q    Are you telling me that you were staying at

10 that hotel?

11     A    No.

12     Q    Okay.  Where were you staying on the night

13 that you were arrested by Sergeant Hull?

14     A    At our new apartment in Deep River that

15 Doris and I had just moved into.

16     Q    Okay.  And when you say you just moved into

17 the apartment, was it that very day or a week?

18     A    About four days previous.

19     Q    Okay.  Just so I understand the sequence

20 then, earlier in 1999 you sold your house on Nod Road?

21     A    Yes.

22     Q    And that you had stayed in a hotel while you

23 were in between locations, and that a few days before

24 you were arrested you had rented an apartment in Deep

25 River?

22

1    A    Yes.

2    Q    What is the hotel you were at when you were

3 in between places?

4    A    It was Room 30 at Saybrook Motor Inn, I

5 believe is the name of it, or Motor Hotel.

6    Q    Okay.  Is that the same place that you were

7 approached by Sergeant Hull?

8    A    Yes.

9    Q    Do you have any brothers and sisters?

10    A    Yes.

11    Q    How many?

12    A    Two brothers and one sister.

13    Q    And let me just go back to the residence.

14 When you owned 53 Nod Road, did anyone live with you

15 other than Doris?

16    A    Just Doris and myself.

17    Q    And when you were at the hotel when you were

18 in between places, was anyone else living with you?

19    A    Just Doris and myself and our cat.  I want

20 to include the cat.

21    Q    All right.  When you were at the apartment

22 in Deep River, was it just you, Doris and the cat?

23    A    And the cat.

24    Q    And what is the address in Deep River where

25 you were staying at the apartment?

34

1    other than Dr. Westling right now?

2        A    I'm supposed to see somebody about stress,

3    but I haven't done so yet.

4        Q    Okay.  Would that be like a psychotherapist

5    or a psychiatrist?

6        A    It's stress management.  Thats all I know.

7        Q    Okay.  And was that on Dr. Westling's

8    recommendation?

9        A    Yes.

10       Q    Okay.  Well, we're at the point in the

11   deposition where I'm going to talk to you about the day

12   it happened.  Do you want to take a break before we do

13   that?

14            ATTORNEY SPINELLA:  I think we should

15            just go right ahead.

16       A    Go right ahead.

17       Q    Okay.  Now, it was --

18       A    I'd like to have some more water, please.

19       Q    Sure.

20            (Whereupon, an off-the-record discussion

21            was held.)

22       A    Don't mind me.  Doris just upsets me.

23       Q    I know.  That's understandable.  Now, just

24   so we don't have any confusion about dates, October 22,

25   1999 is the specific date given for your arrest for

1  driving while under the influence by Sergeant Hull, all

2  right.  And it was after midnight at the time you were

3  arrested, so the day before was October 21, '99.  Do

4  you follow?

5       A     Yes.

6       Q     So I want to ask you about that day before,

7  October 21, 1999.  And do you remember what you did

8  that day?

9       A     Yes.

10      Q     Tell me what you did, sir, please.

11      A     Prepare our apartment.

12      Q     Okay.  So you've already told me that within

13  the previous few days before you had just moved into

14  your Deep River apartment?

15      A     Yes.

16      Q     What were you doing in general when you say

17  "prepared the apartment"?

18      A     Painting, moving our belongings.

19      Q     All right.  And did there come a time when

20  -- well, take me through the whole day.  You can say we

21  worked on the apartment until five and then I had

22  dinner and then I did this and then I did that.

23      A     I can tell you exactly.  The date in

24  question, I don't quite understand why the time frame

25  has been switched.  When was I arrested?  May I ask you

1  that?

2      Q      Let me find that out for sure, and make sure

3  I haven't confused you.

4      A      Because I am very confused at this point.

5      Q      I think you were taken to the police station

6  at about 1 a.m.

7      A      That's impossible because Doris would shoot

8  me.  I had our cat with us.  Our cat was with me going

9  shopping.

10            ATTORNEY SPINELLA:  I think the arrest

11            was at ten o'clock.

12      A      Yeah, there's a big time frame difference.

13  Doris would never --

14            ATTORNEY SPINELLA:  Can we just go off

15            the record?

16            ATTORNEY GERARDE:  Off the record.

17            (Whereupon, an off-the-record discussion

18            was held.)

19      Q      In other words, let's not -- we're back on

20  the record.  I'll just state for the record that we've

21  been off the record trying to figure out the exact time

22  of arrest.  It's not critical to my questions, because

23  we can go by reports or memories or whatever.  But I

24  just want you to take me through the day right up until

25  the time you were arrested.

1      A      I had rented a U-Haul rental truck to take

2   our belongings from a storage company because we had

3   stayed in a motel for six weeks and two days.  We had

4   been moving, painting and cleaning our new apartment.

5   Doris asked me to go, not to the Adams Supermarket in

6   Deep River, but to go to Super Stop & Shop in Saybrook.

7   So because our cat "Doodlebugs" loved to take rides, if

8   I jingled the car keys, the cat would run to the car

9   and hop on the dashboard and go to the market with me.

10      Q      Okay.

11      A      As silly as it may sound.  I told Doris

12   while I'm in Saybrook I was going to stop over Steve's

13   place, who lives not but a mile and a half or two from

14   Super Stop & Shop, who didn't have an automobile.  He

15   does but it's broken down.  That I would give Steve a

16   ride if he needed anything at the grocery market, Stop

17   & Shop.  We went to Stop & Shop.  I had empty cans and

18   soda bottles.  I picked up all of our groceries.  And I

19   was followed by a police car.

20      Q      Can I stop you there for just a minute?  The

21   Steve you're talking about is Steve White?

22      A      Yes.

23      Q      And Steve White was living where at that

24   time?

25      A      He has just gone through a divorce, and he

40

1       A       Nothing.

2       Q       Thank you.  I just wanted to be clear about

3    that.  All right.  So you and Steve are in the car

4    heading back from grocery shopping, and tell me what

5    happens.

6       A       At the stoplight of the Boston Post Road,

7    and I don't know the name of it, that corner, the

8    street, I'm sure it's in the police report, I took a

9    left.  I saw the police car behind me following me.

10   And the light takes approximately maybe four to six

11   minutes.  It's a very very long light before the arrow

12   turns green.  The police car followed me in.  When I

13   got out of the car with Steve, I was asked for my

14   driver's license, registration, the insurance.  And

15   upon giving this material to the police officer, I was

16   immediately told to face against the vehicle and to put

17   my hands behind my back and I was arrested immediately.

18       Q       Okay.  Let me back you up just a little bit.

19   First of all, what was the car that you were driving?

20       A       Doris's car.

21       Q       Is that a Ford?

22       A       Well, it's a 240 SX XL red convertible,

23   Nissan.

24       Q       Nissan 240 SX --

25       A       -- XL --

46

1  you've told me?

2      A      None whatsoever.

3      Q      So what you're saying is he asked you for

4  your license, registration, insurance, and you said,

5  Here you go, Officer, or words to that effect?

6      A      Then he told me to get out of the vehicle

7  and to lean against it.

8      Q      Facing forward?

9      A      Facing against the vehicle and put my hands

10  behind my back.

11     Q      Did you say anything to him?

12     A      Nothing.

13     Q      So, in other words, just so the time period

14  is clear for the question, after he asked you to get

15  out of the vehicle and to face the vehicle and put your

16  hands behind your back, you had -- no words came out of

17  your mouth; it was just him?

18     A      Nothing whatsoever.  But not between the

19  policeman and myself.  But I asked Steve, Steve White,

20  to make sure that he'd watch for the cat, because Doris

21  and I loved our cat.  And I said, Steve, please make

22  sure Doodlebugs is going to be okay.

23     Q      Because Doodlebugs was in the car with you?

24     A      Yes.

25     Q      And now Steve was now at his house?

47

1      A      Directly in front.

2      Q      So what was your plan?  That the cat

3  wouldn't just be left alone in the car, that Steve

4  would watch out for the cat?

5      A      Yes.  Our cat was a thoroughbred Siamese

6  declawed, which you have to be very careful.  You

7  cannot let a cat like that go outside.  Doodlebugs was

8  an inside cat with a leash at all times and used to

9  love to go for rides.  When I would go to the market or

10  Doris and I went anywhere, the cat came with us.

11      Q      And the cat could stay in the car while you

12  --

13      A      Yes.  I did not want that cat to be hurt, to

14  be let outside loose.  And I asked Steve, please watch

15  the cat, because I was handcuffed.  And I figured if

16  I'm being handcuffed, there must be a reason.  I'm

17  sorry, I'm thinking about the cat.

18      Q      All right.  Did Steve respond to you?  Did

19  he say, okay, don't worry?

20      A      Yes.  He said, don't worry about anything.

21      Q      Did Steve say anything else to you?

22      A      That was it.  I was immediately put in the

23  back of a police car.

24      Q      Do you remember which policeman it was that

25  approached your car?

48

1      A      He had a white shirt.

2      Q      A police officer in uniform?

3      A      With a white shirt.

4      Q      Am I correct about that, it was a uniform?

5      A      Yes.  Wearing a white shirt.

6      Q      Are you able to give me any other

7  information about what officer it was?

8      A      I think his name was Hull.  And then there

9  was another patrol car that immediately showed up and

10 he had a gray shirt.

11     Q      Do you know the name of that officer?

12     A      I believe his name was Demarco.

13     Q      Okay.  Now, what, if anything, did that

14 second officer do?

15     A      While I was in the back of the police car,

16 sitting in the back seat of the police car handcuffed,

17 they were talking.  And the guy with the gray -- the

18 policeman with the gray shirt was pulling everything

19 apart inside the car.

20     Q      What car?

21     A      Doris's car.

22     Q      All right.  Did that second police officer

23 have any interaction with you at all?

24     A      No.

25     Q      So by the time the second police officer

53

1          night?

2      A    No, not that night.

3      Q    We'll break that up.  First of all, we know

4   you were taken to the police station and you were

5   arrested and processed and all that.  Did you see that

6   police officer in the gray shirt when you went to the

7   police station that night?

8      A    Yes.

9      Q    So he went back to the station according to

10  what you remember?

11     A    Oh, yes.

12     Q    Tell me, what happens while you're in the

13  police cruiser with the officer who wore the white

14  shirt before you get to the station?

15     A    Nothing.

16     Q    Is there any conversation between the two of

17  you?

18     A    Nothing.

19     Q    Did he ask you any questions?

20     A    No.

21     Q    Did you ask him any questions?

22     A    I asked him why he stopped me.

23     Q    And what did he tell you?

24     A    He wouldn't answer me.

25     Q    So you're saying you asked him why was I

54

1  arrested?

2      A      Yes.

3      Q      And he just drove?

4      A      Did not answer a question.

5      Q      Did he say anything to you at all?

6      A      Nothing whatsoever.

7      Q      How long a trip from the motel to the police

8  station, do you know?

9      A      Three minutes possibly.  I'd never been to

10  the Saybrook Police Department.  I never knew where it

11  was.

12     Q      So it was a few minutes?

13     A      Just maybe two minutes.

14     Q      When you were taken out of the police

15  cruiser, where were you brought?

16     A      Into a very small room.

17     Q      Okay.  And what happened inside that room?

18     A      I was told to stand facing against the wall.

19     Q      All right.  Did you do that?

20     A      Yes.

21     Q      And then what happened?

22     A      I heard somebody else come in.  Because

23  there were two police officers now.

24     Q      Okay.  I want to stop you.  I want to ask

25  you, who was the person who told you to stand against

1  the wall?

2      A      The police officer with the white shirt.

3      Q      So then that person is still there and

4  someone else came in you say?

5      A      Yes.

6      Q      Tell me what happened.

7      A      I turned around because I heard talking and

8  I heard noise behind me.  Should I say it?

9      Q      You can say whatever it is.

10             ATTORNEY SPINELLA:  Just respond to the

11             question.

12      A      "I told you to face the fucking wall."

13      Q      Who said that, if you know?

14      A      The cop with the white shirt.

15      Q      And then what happened?

16      A      I was grabbed from behind, and my head was

17  smashed against the wall until I was just knocked out.

18  That's all I can remember, being knocked out.

19      Q      Okay.  Are you saying that your head was

20  smashed against the wall face first?

21      A      Yes.

22      Q      And are you saying it was smashed against

23  the wall one time or more than one time?

24      A      I remember twice, seeing two tremendous

25  flashes, like a flashbulb went off in your face.  And I

1  screamed out "Why are you doing this to me?"  Here we

2  go again.

3      Q      Was there any response to that?

4      A      No.  After that I don't remember anything

5  because I just woke up face down in a pool of blood.

6  And the two of them that were there, one had the gray

7  shirt, one had the white shirt.

8      Q      All right.  So tell me, do you know the name

9  of the one with the gray shirt that was in this small

10  room?

11     A      That's Demarco.  He has harassed my father

12  and he has harassed me.

13     Q      I want to try to put that aside, if we can,

14  just so we can find out what happened.

15     A      Can I use the bathroom?

16            ATTORNEY GERARDE:  Off the record.

17            (Whereupon, a recess was taken at 12:30,

18            and the deposition resumed at 12:37.)

19     Q      So when we left off you were in this small

20  room, and you told me what happened with the

21  conversation you had with officer in the white shirt.

22  And you said that a second officer who you say is

23  Demarco came in.  And my question for you is, are you

24  able to tell me who it was that you say pushed you into

25  the wall?

1    A    I believe that it was the one with the white

2  shirt.

3        Q    And you believe it happened two times?

4    A    I know that my head was smashed against the

5  wall twice.  After that, I don't remember anything.

6        Q    Until when?

7    A    It could have been two years later.  When I

8  regained consciousness, I only know that my face felt

9  very warm, my hands were very warm, and I realized this

10  was all blood.  And when I look over, my head was

11  facing to the right.  The handcuffs were removed from

12  me at this point in time, and Demarco was standing next

13  to me.  His shiny black shoes were standing within

14  inches of my face.

15        Q    Okay.  So you're saying -- we're going to

16  get you to the point where you said "the next thing I

17  remember."  The next thing you remember is you were on

18  the floor?

19        A    Yes.

20        Q    And you were in that same room?

21        A    Yes.

22        Q    And you said there's blood on the floor?

23        A    Yes.

24        Q    And Demarco is in the room?

25        A    Yes.

58

1    Q    And is anyone else in the room?

2    A    At that time the cop with the white shirt

3  had walked out and Demarco was immediately standing to

4  my right.  My head was faced to the right.

5    Q    Did you want to tell me something else?

6    A    When I realized that it was blood coming out

7  of my mouth and out of my nose and out of my eye, I

8  took the blood, like this, from my mouth and I smeared

9  it down the pant leg of Officer Demarco.  He had the

10  gray shirt.  And I said, "Here, have some of my DNA."

11    Q    You remember saying that?

12    A    Oh, yes, indeed I do.

13    Q    So let me ask you this:  Is that when you

14  are on the floor -- well, let me ask you this:  So you

15  don't remember anything else happening between the time

16  you say your face hit the wall and then you kind of

17  come to --

18    A    Twice my face was smashed against the wall.

19    Q    So between that time and the time that you

20  realized you're on the floor and there's blood, did

21  anything else happen that you remember?

22    A    I wouldn't know.  I was unconscious,

23  completely unconscious.

24    Q    So you now told me you wiped blood from your

25  face and wiped it on Demarco?

1   No one doubts that.  You keep saying "she would kill

2   me," were you not allowed out after a certain time, or

3   was she expecting you home with the cat?

4       A     Yes.  Because I just went grocery shopping.

5   We had just moved in to a new apartment.

6       Q     So what you're saying is if you had stayed

7   out later or for several hours then you would have been

8   in trouble with Doris?

9       A     Yes, of course.  Because's why -- I don't

10  understand where they come up with one o'clock in the

11  morning.  That's when -- I'm sure that's when they

12  released me.

13      Q     So do you think you were in the police

14  station for four hours?

15      A     Probably.  I was unconscious.  Because I

16  don't remember getting my eye kicked in or four broken

17  ribs or a broken left arm.  I don't remember that.  I

18  can remember having my face smashed against a wall

19  twice.  After the second time that I saw a flash, like

20  a flashbulb, I don't remember anything except waking up

21  in a puddle of blood and wiping it against the guy with

22  the gray shirt.  I wiped it right down his leg and I

23  said, "Have some of my DNA."  And I'm sorry, here I go

24  again.

25      Q     One of my questions was going to be, how

75

1  what happened in the first interview room and then in

2  the second interview room.  You don't have to go

3  through all that again because that's all been written

4  down.  I'm just wondering, is there anything that's in

5  your mind that you can think of now that you haven't

6  told me that happened between you and the police?

7       A    Before or after?

8       Q    That's a very good question.  I appreciate

9  that.  Because I know that you believe things have

10 happened with the police after this.

11      A    Oh, yes, yes, indeed.

12      Q    We've got to keep that aside for right now.

13 I'm talking about this night.  This one particular

14 arrest.  I know what you've told me already about the

15 motel parking lot.  I know you've told me about the

16 first interview room, the blood on the floor, the

17 second interview room.  And that's all been preserved.

18 You don't have to go through any of that.  I'm just

19 wondering, is there anything else that happened that

20 night between you and the police?

21      A    No.

22      Q    Is there any other police officer that you

23 can think of that was involved at any phase of this,

24 either at the motel or at the station?

25      A    Yes.

1       Q       Tell me about that.

2       A       The desk sergeant.

3       Q       Do you remember a name?

4       A       No.  But I'm sure you could get that on

5    record.

6       Q       I think we can.

7       A       I will bring this to your attention for one

8    simple reason:  I have been arrested so many times that

9    I'm quite familiar with the Saybrook Police Department,

10   the building, the structure of it, the rooms.  And I

11   can say for sure -- I hope this is being taken down --

12   that if I sit in the same room where I was beaten and I

13   can hear the voices of the desk sergeant talking to a

14   police officer, then why was it that when my head hit

15   the wall the first time and I was screaming and crying

16   out "Why are you doing this to me," to the two police

17   officers, Mr. Gray and Mr. White, who were doing this

18   to me, that the desk sergeant didn't come in and say,

19   Hey, guys, what are you doing to this man?  You see,

20   because the desk sergeant, if I can hear him talk --

21   and I've been in this police station now so many times

22   -- why the third person who witnessed with his ears and

23   witnessed with his eyes didn't come and say, Come on,

24   what are you doing?  That is my statement, and I hope

25   that's on record.

77

1    Q    It certainly will be.  You're going to get a

2   chance to actually review this so you can make sure.

3    A    I'm sorry.  This is just rehashing the whole

4   doggone thing over again.

5    Q    Let me walk through this and see if I

6   understand.  What you're saying is -- well, first let

7   me make sure, there was nothing else physical between

8   you and any other officer?

9    A    No.

10    Q    And what you're saying is that you would

11   have expected a desk sergeant, who clearly would have

12   been in earshot of what was happening and could easily

13   see what was happening, would have intervened and not

14   let what happened to you happen?

15    A    Yes.  A little intervention would have been

16   helpful for the little Danish man.

17    Q    Okay.  First of all, are you telling me

18   there was someone sitting at the desk?

19    A    Yes, there was.  An older gentleman.

20    Q    Do you happen to know the name?

21    A    No.  I had never been in the police

22   department in my life.

23    Q    All right.  So did you have any

24   conversations you can remember at all with that person,

25   that person sitting at the desk?

1       A       No.

2       Q       Now, other than what you've told me now, is

3       there anything else that the police did on that night

4       that you have a problem with?

5       A       No.

6       Q       So you've told me it all?

7       A       Yes.

8       Q       With respect to that night?

9       A       Yes.

10      Q       Now, I want to ask you about that officer

11      with the gray shirt at the motel parking lot.  Are you

12      saying that that officer is the same officer that you

13      wiped the blood on?

14      A       Yes.

15      Q       Okay.  And are you sure of that?

16      A       Yes.  He's the officer -- if this is going

17      on record, he's the officer that tore open the plastic

18      garbage bag that had the soda and beer cans in it that

19      wouldn't go into the machine while I was in the police

20      officer's car with the white shirt.

21                      ATTORNEY SPINELLA:  I don't want to be

22                      an obstructionist here, but we have gone

23                      over this at least three, four times, that

24                      he's testified it's the same person.  I

25                      think I've been pretty liberal about it.  I

1               really would appreciate it if you could just

2               move on.

3                    ATTORNEY GERARDE:   That's fine.

4       Q     So I want to be clear about this though:

5    Are you saying that you didn't have anything alcoholic

6    to drink that night?

7       A     No.

8       Q     Or during the day?

9       A     No.

10      Q     Okay.  So if you had taken a breath test, it

11   would have been a zero point zero, not even a sip?

12      A     Except drinking too much tea, because I'm a

13   tea drinker.  No, no alcoholic beverage.

14      Q     And when you were in the presence of the

15   officer, you weren't under the influence of alcohol?

16      A     No.  And I don't take drugs or smoke

17   marijuana or do crack or cocaine.  Why is this starting

18   all over again?

19      Q     We're getting close.

20                   ATTORNEY SPINELLA:   That is another

21              question that's been asked at least three

22              times here today.

23                   THE DEPONENT:   I wish Doris was alive.

24                   ATTORNEY SPINELLA:   Just relax, Karl.

25              Maybe we can just move on.

```
 1                  THE DEPONENT:  Just move it away from
 2           me.  Who's going to pay my hospital bills?
 3                  ATTORNEY SPINELLA:  Let's just get done
 4           with this.
 5      Q    We're getting there, Karl.
 6      A    I hope so.
 7      Q    You and Steve White left the police
 8  department?
 9      A    Yes.  His girlfriend and him picked me up.
10      Q    Where did you go?
11      A    We went right to his place where our cat
12  was.  Where Doris and I, our cat.
13      Q    Okay.  I understand that.  What happened
14  when you were over there?
15      A    I stayed there and I called Doris.  And
16  Steve White used to be a corpsman.
17      Q    A corpsman?
18      A    A corpsman.  Do you know what a corpsman is?
19      Q    No.  Tell me, please.
20      A    He has a red cross on his helmet.  He lost
21  his eye in Desert Storm.
22      Q    Steve did?
23      A    Stephen White lost his eye in Desert Storm.
24  And he looked at me and goes, "You can't go anywhere.
25  You're going to sit up all night.  You've got a
```

1   concussion."  And he goes, "And don't look in a mirror

2   because it seems to me your eye is ready to pop out of

3   your head."  He says that I better get to the hospital,

4   and he called Doris up.  And Doris says to me, "Where

5   in the hell have you been?"  And then I said, "Honey,

6   I'm fine."  She goes, "Were you in an automobile

7   accident?  How's the cat?"  I said, "Don't worry about

8   me."  Steve's a corpsman.  He says to me, "You've got a

9   concussion.  You can't go to sleep because somebody

10  with a concussion, if they go to sleep, you can have an

11  aneurysm."  And he knows because he's a corpsman.

12      Q     I understand.  All right.

13      A     I'm tired of this thing.  Why am I going on

14  with this?

15            ATTORNEY SPINELLA:  Just be patient.

16      Q     Walk me through it in time frames.  So what

17  happened during the next several hours?

18      A     I just sat up all night.  I had a couple of

19  beers with him.  He had to go to work.  He used to work

20  at Ames.  And I was with our cat, with Doris and my

21  cat.  And we just sat up and watched TV.  He said,

22  "You're not going to sleep."  He said, "You cannot fall

23  asleep after this."

24      Q     Are you saying you drank beer with Stephen

25  White?

82

1    A    Oh, afterwards.  This is after the fact.
2  Before I went to the hospital in the morning at around
3  seven o'clock.  He said to have a cold beer and sit up
4  with me because you're not going to go to sleep because
5  you could have a brain aneurysm.
6    Q    Okay.  You're saying Steve White said this
7  to you?
8    A    Yes.  He was a corpsman.  That's a medic.
9    Q    I'm understanding you.
10    A    Okay.
11    Q    So how many beers would you say you had with
12  Steve White?
13    A    Maybe one, one and a half.  I just sat up
14  all night.  He said I couldn't go to sleep.  He said
15  because I could have an aneurism.
16    Q    Was there some reason why you didn't go to
17  the hospital right away?
18    A    For two reasons.  I couldn't see straight.
19  I could not see straight.  Steve's car was broken down,
20  which is why when I went grocery shopping, and he lives
21  a few miles from Stop & Shop, that I told Doris, I
22  said, I'm going to stop at Steve's to see if he needs
23  groceries, because his car was not running.  So who's
24  going to drive me home?  Steve?  He's got to go to work
25  in just a few more hours, and he sat up with me all

1  night long.  He worked at Ames in Saybrook.

2      Q     So are you saying that you didn't have any

3  way of getting to the hospital?

4      A     Not at that time.  He didn't want to drive

5  me.  He had to go to work.  And I was so dizzy -- and

6  boy, that's a beautiful picture.  That wasn't even half

7  of what -- I'm sorry.

8            ATTORNEY SPINELLA:  Karl, that's not

9            the question here.

10     A     I feel like I'm being punished.

11     Q     I'm just walking you through sequentially

12 what happened.  So you stayed at Steve White's.  You

13 had one or two beers with Steve White?

14     A     Not even two beers.

15     Q     Not even two?

16     A     And then my cups of tea.  I usually have

17 four or five cups of tea.

18     Q     And there was a time that you did go to the

19 hospital?

20     A     Oh, yes.  Immediately following after I went

21 to take the cat home to Doris at our new apartment, and

22 she looked at me and said, "I'm taking you to the

23 hospital."

24     Q     Okay.  So what you're saying is you stayed

25 at Steve White's and then you got in Doris's Nissan --

84

```
 1       A       -- 240 SX XL.

 2       Q       And you and your cat then drove back to Deep

 3   River?

 4       A       Yes.

 5       Q       About what time was that the next morning?

 6       A       Approximately six-thirty.

 7       Q       A.m.?

 8       A       Yes.  Approximately.

 9       Q       So you arrived at the apartment at Deep

10   River --

11       A       Yes.

12       Q       -- and saw Doris?

13       A       Yes.

14       Q       And Doris said what to you?

15       A       "Honey, you better go to the hospital."   I

16   keep repeating it.  I think I've told this story a

17   hundred thousand times.

18                    ATTORNEY SPINELLA:  I think that's

19               already been said.

20       Q       How did you get to the hospital?

21       A       Doris drove me.

22       Q       What happened at the hospital?

23       A       They looked at me, and the emergency room

24   person said to me, "You were wearing bracelets last

25   night."  And I'm looking at him and I'm saying what do
```

1  you mean I was wearing bracelets?  He says, "You must

2  have been in jail or arrested."  I said, "I would

3  rather not say anything."  He said, "Well, I can tell

4  by" -- this was the doctor who was putting the cast on

5  my arm, on my left arm.  And I had all black and blues

6  and cuts on my wrists, on both wrists.  And he said --

7  his words were, "You were wearing bracelets last

8  night."

9       Q      Did you tell anybody at the hospital about

10  what happened at the police station?

11       A      No, I did not.

12       Q      What -- I have the records, so I don't have

13  to ask you that kind of detail.  But I know you were at

14  the hospital that morning, then you left.  You didn't

15  stay in the hospital for days or anything; is that

16  right?

17       A      No.  They bandage up your nose.  They put

18  cotton, stick it inside.  They put a fiberglass cast

19  on.  They're made of fiberglass now, not like the old

20  days when they were made of cement or plaster or

21  whatever.  And that's the way I was for almost two

22  months, with a cast on my left arm.

23       Q      Did you have any type of treatment or

24  rehabilitation after that day with respect to either

25  your nose or your elbow?

1       A       Oh, yes.  My eye.

2       Q       Let's leave the eye aside for a minute.

3       A       That was all part of it, because I never had

4    to wear glasses in my life.  This stuff all started

5    afterwards.

6       Q       I understand you're making a claim about

7    your eye.

8       A       I'm not making a claim about anything.  I'm

9    just telling you the truth.

10      Q       Tell me about this:  Did you have any

11   therapy on your elbow other than just having a cast on

12   it?

13      A       Yes.

14      Q       Tell me about that.

15      A       I've seen so many doctors since then.  Then

16   I also had EKGs where they put all the wires to your

17   head.  They put all these wires to your head when you

18   start getting headaches.  You look like medusa.

19   There's blue, green, yellow, orange, you name it, and

20   they put wires to your head and put you in a room and

21   turn out the lights and do whatever, I don't know.

22   They must have records of that.

23      Q       I'm not sure I've seen that record, though.

24   Tell me, when did that happen?

25                      ATTORNEY SPINELLA:  He's talking about

```
 1              the MRI or a CAT scan, rather, that shows a
 2              frontal hematoma of the frontal lobe of the
 3              brain.
 4                   THE DEPONENT:  You know all about it.
 5              You know more than I do.
 6                   ATTORNEY SPINELLA:  Maybe we should
 7              take a break here.
 8                   (Whereupon, a recess was taken at 1:15,
 9                   and the deposition resumed at 1:20.)
10                   ATTORNEY GERARDE:  Do I have that?  I
11              don't believe I've seen the CT of the brain.
12                   ATTORNEY SPINELLA:  I'll show it to you
13              before you -- before we leave.
14      Q    Mr. Hogfeldt, when you were working full
15   time, did you file tax returns?
16      A    Yes.
17      Q    So they're on record somewhere with the IRS?
18      A    Of course.
19      Q    When you went to court after this arrest,
20   this DWI arrest, what happened at court, do you
21   remember?
22      A    There were so many postponements.
23      Q    Ultimately what happened?  Do you remember,
24   did you plead guilty to the DWI charge?
25      A    I was told by Bruce Newman and Paul
```

1  Leveloski to carry on with this case, to file nolo

2  contendere.  Is that how you say it?

3              ATTORNEY SPINELLA:  Off the record.

4              (Whereupon, an off-the-record discussion

5              was held.)

6      Q    Mr. Hogfeldt, what you're saying is that you

7  don't have a clear recollection of what actually

8  happened to your criminal charges, and we'll get that

9  either from the court records or from your lawyer

10  telling us?

11      A    I believe so.

12      Q    I want to ask you -- I'm not going to ask

13  you anymore questions about whether or not you were

14  drinking, but was there anything improper about your

15  driving that night when the police officer was behind

16  you, such as going over the center line?

17      A    No.

18      Q    Going through a red light?

19      A    No.

20      Q    Going faster than the speed limit?

21      A    No.

22      Q    And you're sure about that?

23      A    Yes.

24      Q    You're sure about that as you are about

25  everything else you've told me about?

98

```
 1                C E R T I F I C A T E

 2

 3      I hereby certify that I am a Notary Public, in and

 4  for the State of Connecticut, duly commissioned and

 5  qualified to administer oaths.

 6      I further certify that the deponent named in the

 7  foregoing deposition was by me duly sworn, and

 8  thereupon testified as appears in the foregoing

 9  deposition; that said deposition was taken by me

10  stenographically in the presence of counsel and reduced

11  to typewriting under my direction, and the foregoing is

12  a true and accurate transcript of the testimony.

13      I further certify that I am neither counsel nor

14  attorney to either of the parties to said suit nor

15  related to or employed by either counsel in said suit

16  nor am I interested in the outcome of said cause.

17      Witness my hand and seal as Notary Public

18  this _____ day of _____ 20 ____.

19

20

21

22                      _____
                        Notary Public
23
                        Connecticut License No. 00181
24                      My commission expires:
                        November 30, 2004
25
```

99

```
 1              CERTIFICATE OF DEPONENT

 2

 3          I, KARL HOGFELDT, have read the foregoing

 4   transcript of the testimony given at the deposition on

 5   Wednesday, July 16, 2003, and it is true and accurate

 6   to the best of my knowledge and/or with the changes as

 7   noted in the attached errata sheet.

 8

 9

10

11

12   _____        _____
     DATE                               WITNESS
13

14   At _____ in said County

15   of_____,

16   this _____ day of _____, 2003, personally

17   appeared Karl Hogfeldt, and he made oath to the truth

18   of the foregoing answers by him subscribed.

19

20

21   Before me, _____, Notary Public.

22   My Commission Expires _____

23
     NO.:  3:01CV1979(WWE)
24   HOGFELDT VS. OLD SAYBROOK POLICE DEPARTMENT
     KARL HOGFELDT  JULY 16, 2003
25
```

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KARL HOGFELDT | : | NO.:  3:01CV1979 (WWE) |
| | : | |
| v. | : | |
| | : | |
| OLD SAYBROOK POLICE DEPARTMENT; | : | |
| SERGEANT DONALD HULL; PATROLMAN | : | |
| DAVID PERROTTI; PATROLMAN CHRIS | : | |
| DEMARCO; PATROLMAN JAY RANKIN; | : | |
| EACH INDIVIDUALLY AND AS POLICE | : | |
| OFFICERS AND MEMBERS OF THE OLD | : | |
| SAYBROOK POLICE DEPARTMENT; AND | : | |
| THE TOWN OF OLD SAYBROOK | : | FEBRUARY 17, 2003 |

**A F F I D A V I T**

I, Sergeant Donald Hull, being duly sworn, depose and say:

1.    I am over eighteen years of age;

2.    I understand the obligations of an oath;

3.    I am a sergeant with the Old Saybrook Police Department;

4.    On October 22, 1999, at approximately 11:00p.m., I made a stop of a vehicle operated by the plaintiff, Karl Hogfeldt, after witnessing the vehicle's erratic operation and excessive speed;

Exhibit B

5.      Upon approaching the vehicle and engaging Mr. Hogfeldt in conversation, I noted a strong smell of alcohol emanating from his breath;

6.      After Mr. Hogfeldt stepped out of the car he had to lean up against the car to maintain his balance;

7.      I noted that Mr. Hogfeldt was slurring his words together as he spoke, and presented himself with glassy and bloodshot eyes;

8.      Mr. Hogfedlt was uncooperative, and refused to perform field sobriety tests;

9.      Patrolman Rankin arrived at the scene in time to witness Mr. Hogfeldt refuse the field sobriety tests;

10.      Mr. Hogfeldt began to walk away.  I then grabbed him by his left arm.  Mr. Hogfeldt exclaimed, "don't touch me" and attempted to pull away.  I then handcuffed Mr. Hogfeldt and placed him under arrest;

11.      I then transported Mr. Hogfeldt to the Old Saybrook Police Department;

12.      Upon information and belief, Patrolman Rankin continued his patrol;

13.      Once inside the interview room, I removed the handcuffs and asked Mr. Hogfeldt to empty his pockets onto the table, at least three times.  Mr. Hogfeldt refused each time, and became increasingly upset;

14.    I then reached over to remove Mr. Hogfeldt's glasses from his shirt pocket. Mr. Hogfeldt pushed my arm away, warning me to stay away;

15.    I then took a hold of Mr. Hogfeldt's left arm and put it behind his back, holding Mr. Hogfeldt against the back interview room wall while I continued to check and empty his pockets;

16.    During this process, I released Mr. Hogfeldt's left arm, as Mr. Hogfeldt had relaxed himself somewhat.  However, I still kept his left hand on Mr. Hogfedlt's left elbow during this time;

17.    Just as I reached into Mr. Hogfeldt's front right pocket, Mr. Hogfeldt yelled "get out of there" and quickly pulled away moving to his left;

18.    As he pulled away, Mr. Hogfeldt fell face first into the wall to his left.  Mr. Hogfeldt did not fall to the ground, but placed both hands on this wall;

19.    I then attempted to look at Mr. Hogfeldt's face, but Mr. Hogfeldt again pulled away, falling to his knees, and leaning over a chair;

20.    At some point, Patrolman Perrotti and Patrolman DeMarco came into the interview room to assist me;

21.    Mr. Hogfeldt became increasingly upset, and had to be held down;

22.      I applied gauze to Mr. Hogfeldt's nose until the bleeding stopped.  Mr.

Hogfeldt refused ice packs, or other medical attention;

23.      I then proceeded to complete the booking process;

24.      I have reviewed the enclosed Incident Report, and the facts contained

therein are accurate to the best of my knowledge.

Dated at Old Saybrook, Connecticut, this 18th ay of February, 2003.


/s/ Sgt. Donald Hull
Sergeant Donald Hull


STATE OF CONNECTICUT              )
                                 ) ss:  Old Saybrook
COUNTY OF MIDDLESEX              )

Subscribed and sworn to before me this 18th day of February, 2003.


/s/ Daniel C. DeMerchant
Commissioner of the Superior Court
~~Notary Public~~
~~My commission expires:~~

# COPY

OLD SAYBROOK POLICE DEPARTMENT
225 Main Street
Old Saybrook, Connecticut    06475
860-395-3142

INCIDENT REPORT

Incident Date: 10/22/99          Officer: 05          Compl: 99-1022-003559

Incident Type: D.W.I. ARREST              Location: RTE 1 AND ELM STREET

| STATUS | LAST NAME | FIRST NAME | MI | DOB | RACE | SEX | |
|--------|-----------|------------|-----|-----|------|-----|---|
| C | HULL | SGT. DONALD | | / / | W | M | |
| | #5 | DEPT OF POLICE SRVCS  OLD SAYBROOK | | CT | | (860)395-3142 | |
| A | HOGFELDT | KARL | R | 10/19/53 | W | M | |
| | 93 | MAIN STREET | DEEP RIVER | | CT | | |
| | | UNREAS SPEED | 14-218A | | | | |
| A | HOGFELDT | KARL | R | 10/19/53 | W | M | |
| | 93 | MAIN STREET | DEEP RIVER | | CT | | |
| | | OP MV U/INFL | 14-227A | | | | |
| O | WHITE | STEPHEN | P | 08/11/65 | W | M | |
| | 63 | HARTFORD AVENUE | OLD SAYBROOK | | CT | | |
| OW | VALENTI | ROBERT | A | 10/12/46 | W | M | |
| | 53 | NOD ROAD | CLINTON | | CT | | |
| W | RANKIN | PTLM JAY | | / / | W | M | |
| | #25 | DEPT OF POLICE SRVCS  OLD SAYBROOK | | CT | | (860)395-3142 | |
| W | DEMARCO | PTLM CHRIS | | / / | W | M | |
| | #23 | DEPT OF POLICE SRVCS  OLD SAYBROOK | | CT | | (860)395-3142 | |
| W | PERROTTI | PTLM DAVID | | / / | W | M | |
| | #16 | DEPT OF POLICE SRVCS  OLD SAYBROOK | | CT | | (860)395-3142 | |
| O | SEAMAN | TAMMY | L | 11/26/58 | W | F | |
| | 11 | SILVER BIRCH ROAD | CLINTON | | CT | | |

WRITTEN REPORT ATTACHED...

# Exhibit C

OLD SAYBROOK POLICE DEPARTMENT
225 Main Street
Old Saybrook, Connecticut 06475
860-395-3142

INCIDENT REPORT

Incident Date: 10/22/1999          Officer: 05          Case Number: 99-1022-003559

Incident Type: D.W.I. ARREST          Location: RTE ONE / ELM STREET

Investigating Officer: Sergeant Donald Hull #5

I was traveling northbound on Great Hammock Road when I observed a small red car cross over the double yellow lines. The car then turned left onto Old Boston Post Road. I pulled up behind the car at the intersection to Route One, the vehicle had Connecticut registration number 270HXB. The car then turned right onto Route One eastbound and while making the turn was completely in the westbound lane.

The car was still in front of me and began to accelerate and crossed over the white line twice. I followed the car at an even distance at a speed of no less then 49 mph for no less then three tenths of a mile in a clearly posted 35-mph zone. At the intersection to North Main Street the car turned abruptly into the left lane. As we went through the intersection I activated my overhead and flashing headlights but the car made no attempt to stop. The car continued into the parking area for the Saybrook Motor Hotel and drove all the way to the back of the parking area.

When I approached the car I found Karl Hogfeldt to be the operator and Stephen White was in the front passenger seat. Hogfeldt was asked for his license and registration and he stated that I had no right to bother him as he was on private property. I again requested his information and he fumbled with his paperwork before giving it to me. Hogfeldt stepped out of his car and had to lean up against his door to maintain his balance. I could smell a very strong odor of an alcoholic beverage on Hogfeldt's breath as he was talking. Hogfeldt was slurring his words together as he spoke and his eyes were glassy and bloodshot.

I asked Hogfeldt if he had been drinking and he stated "That's none of your fucking business". Hogfeldt was asked again and he said that he had a few beers but was going to stay at the motel tonight with his friend so I could leave now. I advised Hogfeldt that I would not be leaving and that I wanted him to do some roadside sobriety tests. Hogfeldt walked to the back of his car and said that he would do whatever he wanted.

When asked Hogfeldt stated that he knew the alphabet and would be able to recite it. I asked Hogfeldt to recite the alphabet and he got to the letter g and then recited "jlmp" and stopped. Hogfeldt then stated that he would not recite any more letters until his attorney was there with him. I asked Hogfeldt if he would do any other tests and he stated that he would not.

Hogfeldt then stated that I was wasting his time and he was on private property so I had no right to stop him. Hogfeldt stated that I had no probable cause and said that he was going home, he started to walk away. I took hold of Hogfeldt's left arm and he told me not to touch him

Incident Date: 10/22/1999          Officer: 05          Case Number: 99-1022-003559

and he attempted to pull away from me. I advised Hogfeldt that he was under arrest for DWI and he was placed in handcuffs and placed in my cruiser. Hogfeldt gave White permission to take his car keys, which he did. While in the cruiser Hogfeldt became verbally abusive. Hogfeldt stated that this was all "bullshit" and I had no right to arrest him. Each time I attempted to talk to Hogfeldt to calm him down he would yell over my voice and said that I was going to lose my job for this. As we arrived at this department Hogfeldt just yelled, "fuck you" each time I attempted to talk with him.

Once inside the interview room I removed the handcuffs and asked Hogfeldt to empty his pockets on the table, he refused. I asked Hogfeldt at least three more times and each time he became more upset. Hogfeldt was demanding a phone call and stated that he would not do anything until he felt like it. I assured Hogfeldt that he would be able to make a phone call but that I needed to be sure his pockets were empty. Hogfeldt again refused, I reached over to remove his glasses from his shirt pocket and Hogfeldt pushed my arm away and told me to stay away from him. I took hold of Hogfeldt's left arm and put it behind his back and held him against the back wall of the interview room as I checked his pockets.

Hogfeldt seemed to relax somewhat so I released his arm and let him put it by his side, I kept my left hand on his left elbow. Just as I reached into Hogfeldt's right front pants pocket he yelled, "get out of there" and quickly pulled away and turned to his left. I no longer had a hold of Hogfeldt and he fell face first into the wall to left. Hogfeldt did not fall to the ground but caught himself as he hit the wall, placing both his hands on the same wall. I turned Hogfeldt around and checked his face but did not see any apparent injury. Hogfeldt then tried to pull away from me again as I was looking at his face. Hogfeldt then slipped to his knees and was now leaning over the chair. I was standing behind Hogfeldt at this point and began checking his pockets. At this time I notice there was some blood dripping from Hogfeldt's face. As I turned him around I could see that he had a bloody nose.

Ptlm. Perrotti and Ptlm. DeMarco then came into the room to assist me, as Hogfeldt was very upset and yelling and screaming and would not let me look at the injury. Hogfeldt deliberately rubbed his right hand in the blood on the floor and then attempted to grab me with that hand, he had to be held down at this point. I continued to talk with Hogfeldt and he began to calm down and let me hold gauze on his nose, which stopped the bleeding. Ptlm. Demarco brought in an ice pack but Hogfeldt refused to use it and refused any other medical attention.

Hogfeldt was brought into the other interview room where I talked with him for some time and he started to calm down and then began to cry. Hogfeldt was now apologizing for his behavior and stated that he had family members who are police officers. Hogfeldt composed himself and continued to apologize. Hogfeldt was asked numerous times if he wanted an ice pack or any further medical attention and each time he refused. There was some minor swelling on the bridge of his nose and Hogfeldt was much calmer at this point.

Incident Date: 10/22/1999          Officer: 05          Case Number: 99-1022-003559

I then read Hogfeldt the rights form, which he said he understood and he signed the bottom of the page instead of the proper location on the form that was pointed out to him. Hogfeldt said that he always signs on the bottom.

I then read section E of the A44 form to Hogfeldt and he was offered the breath test. Hogfeldt was given the opportunity to contact an attorney but stated that he would not take the breath test, Ptlm. Perrotti witnessed this refusal.

Hogfeldt was processed for DWI and Unreasonable Speed; he was given a verbal warning for Failure to drive in the Proper Lane. Hogfeldt was also issued temporary license number 0162311. During processing Hogfeldt stated that he knew he had too much to drink but that he was moving to Arizona in a few months and did not want to have to deal with all this now. White called this department and stated that he could come down with Tammy Seaman and give Hogfeldt a ride home, Hogfeldt agreed to this. Hogfeldt then began to cry again and continued to apologize for his behavior.

Hogfeldt was released on a $500.00 non-surety bond with a court date of 11/01/99. Hogfeldt was released with all his paperwork and belongings at 02:00 hours. White and Seaman were advised of the injury to Hogfeldt and of his behavior, they both stated that was how Hogfeldt acts when he has been drinking. Hogfeldt was turned over to them without incident.

Investigating Officer: Sergeant Donald Hull #5 _____

Subscribed and sworn to before me this 22nd day of October, 1999

Notary _____

**APPEARANCE BOND**
JD-CR-4 Rev. 5-97
C.G.S. 53a-172, 53a-173, 54-2a, 54-63c,
54-63d, 54-63e, 54-64a, 54-64b, 54-64c, 54-66
P.B. Sec. 654, 656, 658, 661, 663, 664, 665, 684, 908

**STATE OF CONNECTICUT**
**SUPERIOR COURT**

**INSTRUCTIONS:** Forward original to Clerk
of Court and give yellow copy to Defendant.



**TO: Any Proper Officer of the State of Connecticut**

| FROM (Name of Defendant) | ADDRESS OF DEFENDANT | ZIP CODE | TELEPHONE NO. |
|---|---|---|---|
| HALFELDT KARL R | 93 MAIN ST. DEEP RIVER CT. | | |

| JUDICIAL DISTRICT OR G.A. | ADDRESS OF COURT |
|---|---|
| 9 | 1 COURT ST. MIDDLETOWN CT. |

| CRIME(S) CHARGED AGAINST DEFENDANT | AMOUNT OF BOND | APPEARANCE DATE AND TIME (less than 14 days from arrest date) |
|---|---|---|
| DWI 14-227A  Unsafe Speed 14-218 | $ 500.00 | 11/01/99   1000 A.M. |

I, the above-named Defendant, understand that I am being released from custody under the Amount of Bond set above.

I promise to appear before the above-named court on the Appearance Date and Time specified above and at any other place and time to which the charge(s) against me may be continued and in any other court to which the charge(s) against me may be transferred.

I also understand that I am being released on a:

☒ **NON-SURETY BOND**   ☐ **SURETY BOND**
☐ **CASH BOND**    ☐ **REAL ESTATE BOND**
☐ **10% CASH BOND** (Must be authorized by a judge (P.B. Sec. 658, 664))
☐ _____

in the above Amount of Bond, to insure my appearance as promised above, until final judgment is rendered.

I ALSO UNDERSTAND THAT IF I FAIL TO APPEAR, in accordance with

the foregoing promises, I will be liable for the full Amount of Bond, including forfeiture of any amount deposited, and I will be committing the crime of FAILURE TO APPEAR and be subject to the following penalties:

1. **IMMEDIATE REARREST, OR ISSUANCE OF A CAPIAS.**
2. **ONE YEAR IN PRISON or $2,000 FINE or BOTH,** if I am charged with a Misdemeanor(s).
   **FIVE YEARS IN PRISON or $5,000 FINE or BOTH,** if I am charged with a Felony(ies).

I also promise to satisfy all the special conditions stated below which were ordered by the court as a condition of my release on an Appearance Bond. I also understand that IF I FAIL TO SATISFY ANY OF THESE CONDITIONS THE COURT MAY MODIFY OR ADD ADDITIONAL CONDITIONS OR REVOKE MY RELEASE.

I have read/have had read to me the notices on the back side of this form and I understand the notices.

**A. SPECIAL CONDITIONS OF RELEASE** (If applicable)
1. Do not commit a federal, state or local crime.

| SIGNED (Defendant) X [signature] | DATE SIGNED (mo., day, yr.) 10-22-99 |
|---|---|
| SIGNED (Parent or Guardian if minor) | DATE SIGNED (mo., day, yr.) |

The above information and statements were subscribed and sworn to before me.

| SIGNED (Police Officer, Assistant Clerk) [signature] | DATE AND TIME SIGNED 0155 M. | JOB TITLE SERGEANT | POLICE DEPT. (If applicable) CSPD   706 |
|---|---|---|---|

**COMPLETE THE APPROPRIATE SECTION BELOW IF A CASH, 10% CASH OR SURETY BOND IS REQUIRED**

**CASH BOND**

| AMOUNT OF BOND $ | TYPE OF BOND ☐ CASH  ☐ 10% CASH | AMOUNT DEPOSITED IN WORDS | AMOUNT IN NUMERALS $ |
|---|---|---|---|

| DEPOSITED BY (Name and address of Depositor) | | ZIP CODE | RECEIPT NO. |
|---|---|---|---|

| CASH TAKEN BY (Signature of Police Off., Bail Comm., Asst. Clerk) | DATE AND TIME BOND TAKEN ___ M. | NAME OF JUDGE AUTHORIZING 10% BOND (If applicable) |
|---|---|---|

I, the Depositor, understand that if the above-named Defendant fails to appear in accordance with the foregoing promises, I WILL BE LIABLE FOR THE FULL AMOUNT OF BOND, including forfeiture of any Amount Deposited.

I also understand that upon discharge of the Bond, as specified above, the Amount Deposited will be returned to the above-named Depositor, less any fee that may be required by statute.

| SIGNED (Depositor) | DATE SIGNED (mo., day, yr.) |
|---|---|

The above information and statements were subscribed and sworn to before me.

| SIGNED (Police Officer, Assistant Clerk) | DATE AND TIME SIGNED ___ M. | JOB TITLE | POLICE DEPT. (If applicable) |
|---|---|---|---|

**SURETY BOND**

| NAME OF SURETY | ADDRESS OF SURETY | TELEPHONE NO. |
|---|---|---|

| LICENSE NO. | TOTAL AMOUNT OF BAIL LICENSED TO GIVE $ | TOTAL AMOUNT NOW SURETY TO (Exclusive of this case) $ | FOR COURT USE |
|---|---|---|---|
| | | | FILE DATE |

I, the above-named Surety, understand that if the above-named Defendant fails to appear, in accordance with the foregoing promises, I will be liable to the State of Connecticut for the above Amount of Bond.

| SIGNED X | DATE SIGNED (mo., day, yr.) |
|---|---|

The above information and statements were subscribed and sworn to before me.

| SIGNED (Police Officer, Assistant Clerk) | DATE AND TIME SIGNED ___ M. |
|---|---|

| JOB TITLE | POLICE DEPT. (If applicable) | SUPERIOR COURT DOCKET NO. |
|---|---|---|

**NOTICE OF RIGHTS**

JD-CR-5 Rev. 2-95
P.B. Sec. 637, 654, 656
C.G.S. §§ 54-1b, 54-2a, 54-63c, 54-64b

STATE OF CONNECTICUT
JUDICIAL BRANCH
SUPERIOR COURT



**INSTRUCTIONS**

TO CLERK OF COURT
1. Prepare in duplicate.
2. Give Original to Defendant.
3. Retain copy for file.

TO OTHER AGENCIES
1. Prepare in triplicate.
2. Give Original to Defendant.
3. Send a copy to Clerk of Court.
4. Retain a copy for your files.

NAME OF DEFENDANT   HOGFELDT KARL R

JUDICIAL DISTRICT OR G.A.   9

LOCATION OF COURT (No., street, town)   1 Court St.  Middletown  Ct.

TELEPHONE NO. OF COURT   343 6300

OFFENSES CHARGED (Also specify statute number)   DWI 14-227a   Unreas Speed 14-218a  49/35

## NOTICE OF RIGHTS

1. You are not obligated to say anything, in regard to this offense you are charged with but may remain silent.

2. Anything you may say or any statements you make may be used against you.

3. You are entitled to the services of an attorney.

4. If you are unable to pay for the services of an attorney you will be referred to a Public Defender Office where you may request the appointment of an attorney to represent you.

5. You may consult with an attorney before being questioned,

you may have an attorney present during questioning and you can not be questioned without your consent.

6. *(Not applicable if you were arrested on a Superior Court Warrant which specified that bail should be denied or which ordered that you be brought before a clerk or assistant clerk of the Superior Court.)*
You have a right to be promptly interviewed concerning the terms and conditions of your release pending further proceedings, and upon request, counsel may be present during this interview.

## ADVERTENCIA DE DERECHOS

1. Usted no está obligado a decir nada en cuanto a esta ofensa por la cual se le acusa, pero puede permanecer en silencio.

2. Cualquier cosa que usted diga o alguna declaración que usted haga puede ser usada contra usted.

3. Usted tiene derecho a los servicios de un Abogado.

4. Si usted no puede pagar por los servicios de un Abogado, usted será referido a la Oficina del Defensor Publico donde puede usted solicitar el asignamiento de un Abogado para representarlo.

5. Usted puede consultar con un Abogado antes de ser interrogado. Puede tener un Abogado presente durante el

interrogatorio y no puede ser interrogado sin su consentimiento.

6. *(Esto no aplica si a usted lo arrestaron con una orden de arresto de la Corte Superior que especificaba que se le negara fianza u ordenaba a usted se le presentara ante el secretario o el ayudante a secretario de le Corte Superior.)*
Usted tiene el derecho de ser entrevistado prontamente acerca de los términos y condiciones de su libertad, pendiente a procedimientos adicionales y sobre solicitud el Abogado Consultar puede estar presente durante esta entrevista.

I, the undersigned, have advised the Defendant of the Defendant's rights as stated above:

SIGNED (Authorized person)

TITLE   Sergeant

DATE AND TIME ADVISED   10 22 99   0111   .M.

I have been advised of my rights as stated above and have received a copy of this notice.

He sido instruido acerca de los derechos que aparecen en esta notificacion, de la cual he recibido copia.

SIGNED (Defendant)

For Court Use Only

FILE DATE

*The Judicial Branch complies with the Americans With Disabilities Act (ADA). If you need a reasonable accommodation in accordance with the ADA, please contact the clerk of court at the address noted above.*

*La Rama Judicial actúa de acuerdo con la ley de Americanos con Incapacidades (ADA). Si usted necesita arreglos especiales en conformidad con esta ley de ADA, haga el favor de ponerse en contacto con las secretaría del Tribunal de Connecticut en la dirección arriba mencionada.*

DOCKET NO.

**NOTICE OF RIGHTS**

**OFFICER'S DUI ARREST AND ALCOHOL TEST**
**REFUSAL OR FAILURE REPORT**
A-44 REV. 10-99



STATE OF CONNECTICUT
**DEPARTMENT OF MOTOR VEHICLES**
ADMINISTRATIVE PER SE UNIT
On The Web at http://dmvct.org

**FOR POLICE USE ONLY**

CASE NUMBER: 99-1022-003559
SUMMONS NUMBER: MW07209
TEMPORARY LICENSE NUMBER: 0162311  ☐ NOT ISSUED
LICENSE TRANSMITTED TO DMV ☑ YES ☐ NO

This report is issued under Section 14-227b of the Connecticut General Statutes.

**INSTRUCTIONS:**
1. Please type or print clearly.
2. Forward completed form to the address below **within 72 hours.** Include (a) the CT operator's motor vehicle license, (b) a copy of the temporary license form (Form No. A-45) and (c) the chemical analysis test results.
3. Attach additional sheets or materials necessary to explain portions of this Report. Such attachments are considered part of this Report and are approved by the Commissioner. The statements and information contained therein are subscribed and sworn to under penalty of false statement.

**TO: ADMINISTRATIVE PER SE UNIT, DEPARTMENT OF MOTOR VEHICLES, WETHERSFIELD, CT 06161-4010**

## SECTION A: OPERATOR AND VEHICLE INFORMATION

| LICENSING STATE | OPERATOR LICENSE NUMBER | NAME OF OPERATOR (Last, First, M.I.) | DATE OF BIRTH |
|---|---|---|---|
| CT | 102980572 | HOGFELDT KARL R | 10 19 53 |

| ADDRESS (Number and Street) | (City or Town) | (State) | (Zip Code) | SEX | RACE |
|---|---|---|---|---|---|
| 93 Main Street Deep River CT. | | | | ☑ M ☐ F | W |

**VEHICLE INFORMATION**

| YEAR | MAKE | MODEL | BODY TYPE | REGISTRATION NUMBER | REG. STATE |
|---|---|---|---|---|---|
| 1993 | NISS | 240SX | Conv. | 270HXB | CT |

☐ COMMERCIAL MOTOR VEHICLE AND OPERATOR HOLDS COMMERCIAL DRIVER'S LICENSE
☐ VEHICLE TRANSPORTING HAZARDOUS MATERIAL        WORK PERMIT ☐ YES

☐ Operation during authorized hours of a work permit
☐ Operation while under suspension
☐ Operation on school property
☑ Operation on public road
☐ Operation in parking lot for ten or more cars

## SECTION B: PRE-ARREST INFORMATION

| TIME (Military) | DATE | LOCATION (Number and Street) | (City or Town) |
|---|---|---|---|
| 0033 HRS | 10 22 99 | No. Main St. | Old Saybrook |

DOES OPERATOR HAVE ANY PHYSICAL HANDICAP INJURY OR ILLNESS WHICH WOULD PREVENT THE OPERATOR FROM PERFORMING ANY PART OF THE FIELD PERFORMANCE TEST?
☐ REFUSED TO ANSWER ☑ NO ☐ YES (Explain)

### STANDARDIZED FIELD SOBRIETY TESTS

| TYPE OF TEST | CHECK APPROPRIATE BOXES DESCRIBING CONDITION OBSERVED | | ☐ Refused to Perform |
|---|---|---|---|
| HORIZONTAL GAZE NYSTAGMUS | ☐ Distinct Jerkiness at Maximum Deviation <br> ☐ Lack of Smooth Pursuit | ☐ Onset of Jerkiness prior to 45 Degrees <br> ☐ Other (Explain) | ☐ Passed Test <br> ☑ Refused to Perform |
| WALK-TURN | ☐ Loses Balance ☐ No Heel To Toe <br> ☐ Raises Arms ☐ Incorrect Number of Steps | ☐ Steps Off Line <br> ☐ Stops To Steady Self | ☐ Starts Too Soon ☐ Passed Test <br> ☐ Turns Incorrectly ☑ Refused to Perform |
| ONE LEG STAND | ☐ Sways While Balancing ☐ Uses Arms For Balance, Raising Over Six Inches <br> ☐ Hopping ☐ Cannot Perform Test, Puts Foot Down Three Times | | ☐ Puts Foot Down ☐ Passed Test <br> ☐ Bends Knee ☑ Refused to Perform |
| OTHER TESTS | Alphabet | | |

PROBABLE CAUSE TO ARREST (Check all applicable)
☑ OBSERVED ERRATIC DRIVING ☑ ODOR OF ALCOHOLIC BEVERAGE ON OPERATOR'S BREATH ☐ FIELD PERFORMANCE (Sobriety) TESTS
☐ OTHER (Explain):

## SECTION C: ARREST

| DATE OF ARREST | TOWN CODE | LOCATION OF ARREST (Number and Street) | (City or Town) |
|---|---|---|---|
| 10 22 99 | 106 | No. Main St. | Old Saybrook |

| POLICE DEPARTMENT NAME | NAME OF ARRESTING OFFICER | BADGE NUMBER |
|---|---|---|
| Old Saybrook P.D. | Sgt. D. Hull | 5 |

☑ OPERATOR WAS APPRISED OF CONSTITUTIONAL RIGHTS (MIRANDA WARNINGS) AT _0144_ HRS. (MILITARY)

## SECTION D: INTERVIEW     ☑ Refused to Answer (RTA)

| ARE YOU INJURED? | IF YES, DESCRIBE YOUR INJURY | ARE YOU ILL? | IF YES, DESCRIBE YOUR ILLNESS |
|---|---|---|---|
| ☐ YES ☐ NO ☑ RTA | | ☐ YES ☐ NO ☑ RTA | |



THIS SIDE UP. THIS EDGE IN.

```
OLD SAYBROOK
INTOXILYZER - ALCOHOL ANALYZER
CT MODEL 5000        SN 68-001633
10/22/1999              03:59EDT

DEPT= OLD SAYBROOK
OPER= HULL 5
SUB=  HOGFELDT,KARL F
CASE #991022003559
INCIDENT LOCATION
     RTE 1
ACCIDENT = N
TYPE = RE        TEST #1

TEST            %BAC     TIME
AIR BLANK       .000    03:59EDT

TEST REFUSED
```

1

```
 1                  UNITED STATES DISTRICT COURT

 2                    DISTRICT OF CONNECTICUT

 3
    KARL HOGFELDT                    :
 4                                   : NO.: 3:01CV1979(WWE)
    V.                               :
 5                                   :
    OLD SAYBROOK POLICE DEPARTMENT;  : JULY 16, 2003
 6  SERGEANT DONALD HULL; PATROLMAN  :
    DAVID PERROTTI; PATROLMAN CHRIS  :
 7  DEMARCO; PATROLMAN JAY RANKIN;   :
    EACH INDIVIDUALLY AND AS POLICE  :
 8  OFFICERS AND MEMBERS OF THE OLD  :
    SAYBROOK POLICE DEPARTMENT; AND  :
 9  THE TOWN OF OLD SAYBROOK         :

10  -------------------------------------------------------
                    DEPOSITION OF DONALD HULL
11  -------------------------------------------------------

12

13  APPEARANCES:

14          SPINELLA & ASSOCIATES
                Attorneys for the Plaintiffs
15              One Lewis Street
                Hartford, Connecticut  06103
16              (860) 728-4900
            BY:  A. PAUL SPINELLA, ESQ.
17

18

            HOWD & LUDORF
19              Attorneys for the Defendants
                65 Wethersfield Avenue
20              Hartford, Connecticut  06114
                (860) 249-1361
21          BY:  THOMAS R. GERARDE, ESQ.

22

        NIZIANKIEWICZ & MILLER REPORTING SERVICES
23                  972 Tolland Street
        East Hartford, Connecticut 06108-1533
24                  (860) 291-9191

25              DONNA M. DECIANTIS, LSR
```

Exhibit D

2

1       Deposition of DONALD HULL, taken on behalf of the

2  Plaintiff in the hereinbefore entitled action pursuant

3  to the Federal Rule of Civil Procedure 30 before

4  Donna M. DeCiantis, duly qualified notary public in and

5  for the State of Connecticut, held at the offices of

6  Howd & Ludorf, 65 Wethersfield Avenue, Hartford,

7  Connecticut, commencing at 2:27 p.m., Wednesday, July

8  16, 2003.

9                 S T I P U L A T I O N S

10       It is hereby stipulated and agreed by and

11  among counsel for the respective parties that all

12  formalities in connection with the taking of this

13  deposition, including time, place, sufficiency of

14  notice, and the authority of the officer before whom it

15  is being taken, may be and are hereby waived.

16       It is further stipulated and agreed that

17  objections other than as to form are reserved to the

18  time of trial.

19       It is further stipulated and agreed that the

20  reading and signing of the deposition are not waived.

21       It is further stipulated that the proof of

22  the qualifications of the notary public before whom the

23  deposition is being taken are hereby waived.

24

25

22

```
 1      A     No, I'm not familiar with those.

 2      Q     You've never reviewed them with your

 3  attorney?

 4      A     No, sir.

 5      Q     What have you reviewed here prior to your

 6  deposition?  What documents have you looked at?

 7      A     I reviewed the case a couple days ago and

 8  just before I came in here.

 9      Q     What do you mean you reviewed the case?

10  What does that mean?

11      A     My police report.

12      Q     Anything else?

13      A     No -- my training record that I gave you.

14            ATTORNEY GERARDE:  Paul, he's including

15            the notice of rights and all that.  That

16            package that you gave me.

17            ATTORNEY SPINELLA:  Oh, okay.

18      Q     You reviewed all the documents your attorney

19  gave to me today?

20      A     Yes, sir.

21      Q     Who drew up the A-44 in this case?  Was it

22  you?

23      A     Yes, sir.

24      Q     And who took your oath?

25      A     I believe it was Patrolman Perrotti, No. 16.
```

1       Q       Who is Cynthia Huckel?

2       A       She's a patrol officer.

3       Q       Okay.  How do you spell her last name?

4       A       H-u-c-k-e-l.

5       Q       So Perrotti and Huckel were both on duty --

6       A       No, I'm sorry.  Perrotti was a witness to

7  the refusal.  So he signed as a witness to the refusal.

8  Officer Huckel signed for the oath.

9       Q       So they were both on duty in the police

10 department while Mr. Hogfeldt was in the department?

11      A       Patrolman Perrotti was.  I believe Officer

12 Huckel came in for the day shift at 7 a.m. or 6:30 a.m.

13      Q       Do you know if Perrotti was present, was in

14 a position to observe the plaintiff for the entire

15 period that he was in the police department?

16      A       Yeah.  He was in a position to, whether he

17 was answering the phones or...

18      Q       Was he the desk sergeant or the desk

19 officer?

20      A       Yes, sir.

21      Q       He's the one taking the calls?

22      A       Yes, sir.

23      Q       How many people were actually in the

24 department while the plaintiff was there?

25      A       Myself, Patrolman Perrotti on the desk, and

1    and let them know it's happening, correct?

2        A    Yes.

3        Q    Now, for example, I know with the

4    State Police when there's a stop made and a call into

5    the dispatcher, they actually have a card system where

6    the dispatcher punches in a card that has a time that

7    the call came in, and then there's a notation made.

8        A    Yes, sir.

9        Q    Does the Old Saybrook -- let's say, at the

10    time of this incident in 1999, did the Old Saybrook

11    Police Department have anything like that?

12        A    Well, what we always did when there's any

13    kind of motor vehicle stop was call into the station

14    and let them know our location and the license plate of

15    the vehicle we were stopping.

16        Q    But what I'm interested in is the card

17    system.  Did you have something like that?

18        A    I really wasn't finished.  The only time we

19    actually take a case number is if we issue a written

20    warning, an infraction, if we take some action other

21    than a verbal warning.

22        Q    That's really not what I'm saying here.  The

23    dispatcher with the State Police -- actually when --

24    the dispatcher himself or herself when they get the

25    call in, they'll take a card and punch it in.  And so

1   the time will appear on the card with a number that

2   signifies the type of stop it is, and then there'll be

3   a notation, you know, Sergeant John Doe or something.

4   My question is, was that kind of system in place with

5   the Old Saybrook Police Department?

6          A     No, sir.

7          Q     Would any kind of notation be made?

8          A     Again, just like I said, if some action was

9   taken, then a case number would be pulled and has the

10  date and time and location and all the information on

11  it.  But that would be the only time.

12         Q     Is there any record at all -- would there be

13  any kind of a record at all to show when it is that you

14  called it in that day when you first came upon

15  Mr. Hogfeldt?

16         A     The Dictaphone records all the radio

17  transmissions, and that gives you the date and time.  I

18  don't know if they still have that for '99.

19         Q     They're probably destroyed by now?

20         A     I really don't know.  I don't know if they

21  keep them that long.

22                ATTORNEY GERARDE:  Off the record for a

23                minute.

24                (Whereupon, an off-the-record discussion

25                was held.)

1    Q    Now, again, let me refer your attention to

2  October -- well, actually, let's say, October 21st,

3  late in the -- that would be in the early morning.  Do

4  you remember -- first of all, when did you come on

5  duty?

6    A    Eleven o'clock.

7    Q    On the 21st?

8    A    Yep.

9    Q    And tell me what you did once you came on

10  duty.

11    A    What I do pretty much all the time.  I check

12  the cases, previous cases for the shifts before mine,

13  since my last shift; assign whoever's working the road

14  with me; review the shift before with the previous

15  sergeant; do vehicle assignments and area assignments;

16  and then, you know, go on patrol myself.

17    Q    And in this particular case, who was on

18  patrol with you on this particular night -- or morning,

19  I should say -- or night?

20            ATTORNEY GERARDE:  Wait.  We're talking

21            about 11 p.m., right?

22    A    Eleven at night to seven in the morn.

23    Q    So when you came on at eleven at night, who

24  was starting that patrol shift with you?

25    A    It was myself, Officer Rankin was on the

1  road and Officer Perrotti was on the desk.

2   Q  And what about Demarco?

3   A  He had worked the evening shift.  His shift

4  ended at eleven, so we were replacing him.

5   Q  So at some point you began patrolling?

6   A  Yes, sir.

7   Q  And what time did you actually go on the

8  road?

9   A  It's usually around quarter after or so,

10  twenty after.  I couldn't remember exactly.

11   Q  Where did you go in this case?

12   A  On the midnight shift, pretty much all over

13  town.  There's no pattern.

14   Q  Do you remember any of the places that you

15  went before encountering Mr. Hogfeldt?

16   A  No, sir.

17   Q  Now, tell me about your -- first of all, had

18  you ever met the plaintiff in this case before?

19   A  I don't think so.

20   Q  Well, you say you don't think so --

21   A  I don't recall.  I mean, if I came across

22  him in passing or something...

23   Q  What about Demarco, did he know him?

24   A  I don't know.

25   Q  Well, you said that you talked about this

1  case with Demarco.  Didn't the issue of whether or not

2  this man was familiar to Demarco ever come up?

3       A     Not that I remember.

4       Q     What about Perrotti, did he know him?

5       A     I don't think so.

6       Q     So you're saying you just don't remember

7  talking to either of those two officers as to whether

8  or not they knew the plaintiff?

9       A     I don't remember the exact conversation.

10  And I don't remember them specifically saying they knew

11  him before this.  I mean, it's possible.  I really

12  don't know.

13       Q     It just seems to me that if you're being

14  sued by somebody, that would be one of the first

15  questions that you would be -- that would arise, as to

16  whether or not you knew who he was.

17       A     Again, it was so long ago, to be honest, I

18  really don't remember the conversation.

19       Q     Now, tell me about your first encounter with

20  him.  What did you see?

21       A     I was traveling northbound on Great Hammock

22  Road, and I saw his car cross over the lines.

23       Q     What kind of a car was it?

24       A     It was a small red car.

25       Q     Then what happened?

1     A     I was still directly behind him.  He had

2  turned left onto Old Boston Post Road.  That's just a

3  short distance to Route 1.  And there's a traffic light

4  there.  And then he turned right onto Route 1.  And he

5  was completely in the other lane.  We were going

6  eastbound now, and he completely went into the

7  westbound lane.  Then he accelerated.  He got up to, I

8  think it was, 49 miles an hour.  He was crossing over

9  the white lines.

10     Q     How do you remember that it was 49 miles an

11  hour?

12     A     From reviewing the report before.

13     Q     Oh, okay.  Then what happened?

14     A     We got to the intersection of Route 1 and

15  North Main Street.  And that's when he took the

16  left-hand turn.  And that's when -- at that

17  intersection -- as we approached that intersection is

18  when I activated all my lights, my emergency lights.

19     Q     And then what happened?

20     A     He continued onto North Main Street, turned

21  a left into the -- it's a long driveway for the motel,

22  drove into the parking area, to the back and then

23  pulled up in front of one of the motel units.  I

24  followed behind him with my lights on.

25     Q     And then what happened?

41

1      A      I got out of the car.  I approached his

2   driver's side door.  Officer Rankin arrived.

3      Q      Officer who?

4      A      Rankin.  Pulled up with his --

5      Q      Now, why did he arrive?  Did you call him?

6      A      Yeah, I called on the radio, and said I

7   believe I had a signal eight, which is a DWI.

8      Q      I'm sorry, you believed that what again?

9      A      I had a signal eight, which is a code for a

10  drunk driver.  So whenever we have a drunk driver, if

11  somebody's available, we always back them up to witness

12  the roadside and...

13     Q      Okay.  Then what happened?

14     A      Patrolman Rankin pulled up.  It was an open

15  parking area.  His car pulled up so his headlights were

16  facing the driver's side door of Hogfeldt's car.  I

17  asked him for his license and registration.  He was

18  pretty agitated.

19     Q      Was he by himself?

20     A      No.  He had a passenger.  That was Stephen

21  White, I think it is.

22     Q      Where was -- did White remain seated in the

23  car during all this?

24     A      During this part of it, yes, he did.

25     Q      And then what happened?

42

1      A      I asked him for his license, registration.
2   I could tell there was a strong odor of alcohol on his
3   breath when he was talking.  He was slurring his words
4   together.  He was very agitated, saying that he was on
5   private property.  He was making a lot of comments like
6   I had no right to stop him.  He was pretty upset that I
7   stopped him.  He had stepped out of his car.  When he
8   stepped out of his car, he fell back up against his
9   door, and he was kind of holding onto it just to steady
10  himself.  I asked him to do the roadside sobriety test.
11  He made some comment to the effect that he'll do
12  whatever he wants, or something to that effect.  I
13  asked him to step to the back of the car and he did.
14  And I believe that's when White got out of the car.
15  And I'm not positive, but I think he asked Officer
16  Rankin if he could go into the motel room.  But he
17  stood there for a while at the front of the car.  I
18  couldn't say exactly how long; I was really just
19  dealing with Mr. Hogfeldt.  I asked him to do the
20  roadside sobriety.  He said that he would.  I asked him
21  to do the alphabet first.  He said that he could.  From
22  reviewing the report, he got to the letter G and then
23  slurred it or did some letters in a random order.  Then
24  he said he wasn't going to do anything anymore, wasn't
25  going to recite the alphabet anymore unless he talked

1  to his attorney.

2      Q      Now, at that point did he make a request

3  for an attorney?

4      A      No.  He just that he wasn't going to recite

5  the letters unless he had his attorney.

6      Q      Well, it says here in your report he would

7  not recite anymore letters until his attorney was there

8  with him.  Don't you -- didn't you interpret that as a

9  request for a lawyer?

10     A      No, sir.

11     Q      Why not?

12     A      I didn't.  I don't know what to tell you,

13  why.

14     Q      I mean, is there a certain protocol that a

15  citizen must pursue before you come to the conclusion

16  that an attorney is being requested?  In other words,

17  in your view, is a citizen required to sign a written

18  form or something of that sort?

19     A      To request an attorney?

20     Q      Yes.

21     A      No, sir.

22     Q      What do you have to do for you to -- what

23  sort of circumstances have to occur before you arrive

24  at the conclusion that an attorney has been requested?

25     A      If I have him in custody and I'm

44

1  interrogating him and he requests an attorney.

2      Q      Was he free to leave?

3      A      Not at that point.

4      Q      He was in custody?

5      A      Yes, sir.

6      Q      Okay.  So that satisfies the first

7  requirement, does it not?

8      A      Sure.

9      Q      So why is it that you did not come to the

10  conclusion that he had requested an attorney?

11      A      He didn't ask for one.

12      Q      It says here that he wouldn't go forward

13  unless he had his attorney with him.

14      A      He said that he wouldn't recite anymore

15  letters unless he had his attorney there.

16      Q      I see.  So if he said, for example, that he

17  would not proceed to the police station unless he had

18  an attorney, would that constitute a request for an

19  attorney in your opinion?

20      A      No.

21      Q      That's still not a request for an attorney?

22      A      No.  What I was doing was trying to

23  determine whether he was fit to drive or not.  I wasn't

24  interrogating him on any other basis.  I was trying to

25  find out if --

1      Q      But you just told me he was in custody.

2      A      He couldn't leave at that point, no.

3      Q      Okay.  By the way, why don't you tell me

4  when in your view your right to conduct an

5  interrogation or question a person in custody ceases?

6      A      Could you be more specific?

7      Q      I'm talking about with respect to whether or

8  not an attorney is requested to be present.  In other

9  words, do you understand that at some point a person in

10  custody has a right to be free of any police

11  questioning until an attorney is present?  You

12  understand that at some point that a citizen has that

13  right?

14      A      Yes, sir.

15      Q      Okay.  And when does that occur?

16      A      A lot of different times.  There's a

17  multitude of situations that would occur.

18      Q      Just tell me generally.  I mean, isn't there

19  a rule about that in general?

20      A      I'm not sure exactly what you're asking.

21      Q      Well, isn't it true that once a person in

22  custody requests that an attorney be present, your

23  right to conduct any interrogation ceases?

24              ATTORNEY GERARDE:  Objection to the

25              form.  You can answer if you understand it.

1        A      I'm not sure I understand.

2        Q      What don't you understand about that

3   question?

4        A      I'm not sure exactly what you're asking, to

5   be honest with you.

6        Q      Is there a form of words that I'm using

7   that's confusing to you?  Let me ask it again.  You

8   stop me when you don't understand what I'm saying.  I'm

9   asking you when your right to interrogate a citizen

10  ends, at what point once that citizen is in custody and

11  says he wants an attorney present.

12       A      If you're looking for an example --

13       Q      Let me put it to you this way, because I'm

14  not trying to be argumentative.  I think the question

15  is clear, but I'll try rephrasing it.

16              Is it true that once a person in custody

17  requests that his attorney be present, is it true that

18  at that point your right to interrogation ceases?

19       A      It would depend on the situation.

20       Q      What situation?  What do you mean?

21       A      If I had a suspect in custody and I was

22  interrogating him about a crime that I thought he

23  committed and he asked for his attorney, I would

24  absolutely stop questioning.

25       Q      Say that again.

1      A      If I had a suspect in custody and I was

2  interrogating him for a specific crime and he stated

3  that he didn't want to talk to me and that he wanted

4  his attorney there, I would immediately stop

5  questioning him.

6      Q      And in this case was the plaintiff in

7  custody?

8      A      Yes.

9      Q      And you were interrogating him about this

10 particular crime, that is to say, DWI?

11     A      I was investigating it, yes.

12     Q      That fits all the qualifications, doesn't

13 it?

14     A      No, sir.

15     Q      Tell me how it doesn't.

16     A      I'm just trying to find out his condition to

17 drive:  If he's fit to drive or not.

18     Q      But you were so convinced that a DWI had

19 occurred, that particular crime, that you called for

20 assistance, correct?

21     A      Yes, sir.

22     Q      So you had a pretty clear idea that -- at

23 least probable cause in your view --

24     A      Yes, sir.

25     Q      -- that a DWI had occurred?

1       A       Yes, sir.

2       Q       Okay.  And the plaintiff was in custody?

3       A       Yes, sir.

4       Q       All right.  So under your own definition,

5   when Mr. Hogfeldt, the plaintiff, said I want my

6   attorney here, I want my attorney present, didn't your

7   right to interrogate cease at that point?

8       A       No, sir.  That's not how I understood it.

9       Q       Okay.  All right.  So after Hogfeldt said

10  that he wanted his attorney there with him, what

11  happened next?

12      A       After he said that he wouldn't recite

13  anymore letters until his attorney was there, he said

14  that he was just tired of all this.  He, again, got

15  upset, and he said he was leaving.  So he turned to his

16  left and started like he was going to walk away.

17      Q       Then what did you do?

18      A       He said he wasn't going to do anymore of the

19  roadside sobriety tests, so I placed him under arrest

20  for driving under the influence.

21      Q       Now, where in your report does it say he

22  refused to take any roadside sobriety test?  Your last

23  statement.

24      A       Can I take a look at that?

25      Q       Sure.

```
 1                    ATTORNEY GERARDE:  Do you want to see
 2              mine, the one that's underlined in the right
 3              spots?
 4        A     Right down here on this first page.  Second
 5   to the last paragraph, the last sentence.  I asked
 6   Hogfeldt if he would do any other tests and he stated
 7   that he would not.
 8        Q     All right.  So then what happened?
 9        A     Put the handcuffs on him, put him in the
10   back of my cruiser, searched his vehicle.
11        Q     Now, at that point --
12                 (The deposition is interrupted by
13                    someone at the door.  Whereupon, an
14                    off-the-record discussion was held.
15                    Attorney Titus takes Attorney Gerarde's
16                    place in the deposition.)
17        Q     At that point he was under arrest for DWI?
18        A     Yes, sir.
19        Q     And based on what?
20        A     Based on my observations.
21        Q     Being what?
22        A     Being the operation of his vehicle.
23        Q     Well, let's be specific about this.  You
24   mentioned, I believe, three events that led you to that
25   conclusion:  Operation of his motor vehicle, the fact
```

1  he smelled of alcohol.  What was the third one, if

2  there was one?

3          A       Slurred speech, glassy bloodshot eyes.

4          Q       Wait a minute.  Slurred speech.  What speech

5  did he slur?

6          A       He was slurring his words together.

7          Q       Tell me the sentence.

8          A       I don't remember the exact sentence.

9          Q       Do you remember the words?

10         A       No, sir.

11         Q       All right.  What was the fourth thing that

12  you mentioned?

13         A       He was very unsteady.  He couldn't maintain

14  his balance when he first got out of the car.  He fell

15  up against the door.

16         Q       Anything else?

17         A       Just the observations, you know, like I

18  said.

19         Q       Now, you mentioned four things.  I want you

20  to be specific.  Is there anything else?

21         A       The alphabet test we just talked about.

22         Q       Well, you said that he conducted the test

23  but he missed one letter and then he stopped.

24         A       He stopped at the letter G.  He hit G and

25  then he recited letters in a random order.

51

1     Q     And then he stopped?

2     A     Yeah.

3     Q     So he went to G and stopped?

4     A     Yep.

5     Q     What else other than that?

6     A     Other than the alphabet?

7     Q     Yeah.

8     A     That's it.

9     Q     Did you bother to question him at all as to

10    whether or not there might have been some other good

11    faith basis for, you know, let's say, his failure to

12    conduct the alphabet or any of these other things that

13    you mentioned?  For example, that he suffers from some

14    sort of illness?  Did you interrogate him as to that

15    possibility?

16    A     The only questioning before that was if he

17    had been drinking.  He said that he had a couple of

18    beers.

19    Q     Did he say he was intoxicated?

20    A     No.

21    Q     So my question is, did you interrogate or

22    explore any other good faith basis for the conduct you

23    observed?

24    A     No, sir.

25    Q     Now, what happened next after he was

52

1  handcuffed?

2      A      We asked -- his friend asked if he could

3  take the keys to the car.  So we asked Mr. Hogfeldt if

4  that would be all right.  We turned the keys to the car

5  over to him, to Stephen White.

6      Q      Then what happened?

7      A      I transported him, Karl Hogfeldt, back to

8  the police department.

9      Q      Where was the other police officer?

10     A      We left at the same time.

11     Q      Where did he go?

12     A      Back on patrol.

13     Q      So you took the plaintiff back to the

14 department on your own?

15     A      Yes, sir.

16     Q      Now, what time did you stop the plaintiff?

17 What time did the stop occur?

18     A      Would have been approximately ten or fifteen

19 minutes before.  So probably about 12:20, somewhere in

20 that area.

21     Q      And when were the handcuffs put on?

22     A      Somewhere around 12:35.

23     Q      How long did it take you to get to the

24 police department?

25     A      Couple minutes at the most.

```
 1                    (Attorney Gerarde takes Attorney

 2            Titus's place in the deposition.)

 3      Q     How long?

 4      A     Couple of minutes.  It's just right down the

 5  road.

 6      Q     Once you got there, what happened?

 7      A     On the way there he was just yelling and

 8  screaming.  I was trying to calm him down, trying to

 9  talk to him.

10      Q     What were you saying to him?

11      A     Telling him to relax, that we can get

12  through this, that the process wouldn't take that long.

13      Q     Were you wearing a white shirt, by the way?

14      A     Yes, sir.

15      Q     Okay.  Go ahead.

16      A     He was just screaming at me that this was

17  all bullshit and he was going to have my job.  And by

18  the time we got back to the station, as I'm pulling in,

19  every time I'd try to talk, he'd just scream "fuck

20  you."  He wouldn't even -- he wasn't listening at all.

21      Q     Did you find that distressing?

22      A     Not really.

23      Q     Just another day at the beach?

24      A     Not another day at the beach, but, you know,

25  it's pretty common.
```

54

1     Q     Then what happened?

2     A     I brought him inside the police department,

3     brought him into the interview room, took the handcuffs

4     off him, asked him to empty his pockets out.  He

5     refused to do that.  I'd asked him several times to

6     empty his pockets.  He refused to do it.

7     Q     Was that distressing?

8     A     No.

9     Q     Then what happened?

10    A     I reached over and tried to take his glasses

11    out of his shirt pocket for him, and he smacked my hand

12    away.  When he did so, he turned kind of sideways to

13    me.  I grabbed his right arm, put him up against the

14    back wall of the room and told him to calm down, talked

15    to him for a minute, said he's got to relax.  He was

16    still, you know, pretty loud.  Then he seemed to relax,

17    calmed down a little bit, so I started to pat him down.

18    I felt something in his front pocket.  I went to reach

19    into his front pocket and he yelled get out of there or

20    stay away from there, something to that effect, and he

21    pulled away to his left, and his face hit the wall to

22    our left.

23    Q     Now, let me ask you, officer, did you

24    memorize your report?

25    A     No.  But I've read it a few times.

1      Q      How many times did you read it?

2      A      At least six times probably.

3      Q      The reason why I ask is your testimony here

4   is virtually word for word what your report says, yet

5   your report is not in front of you.  So my question is,

6   did you memorize it?

7      A      I don't think so.  I think it's just the

8   truth, sir.

9      Q      I'm talking about the form of words.  The

10  exact form of words follows this line by line.

11     A      I can tell you, I don't remember exactly the

12  whole report.

13     Q      And this is a three-page report.  So you're

14  saying you only read this six times?

15     A      Maybe six times.

16     Q      That's it?

17     A      Yes, sir.

18     Q      And that's the truth?

19     A      That's the truth.

20     Q      Yet you have it memorized line by line.

21  Continue.  What did you see next?

22     A      When his face hit the wall he immediately

23  put his hands up on the wall.  And I turned him around

24  to see if he was okay.  There was no obvious injury.

25  And I continued -- I was going to search his pocket

1  again because I was really concerned that maybe he had

2  something in there.  And he tried to pull away again,

3  and this time he just went down to his knees.

4      Q     Why were you really concerned that he had

5  something in there?  Did he say that he had a weapon,

6  or did you have any good faith basis for believing he

7  might be armed?

8      A     I was concerned because he got so upset that

9  I tried to put my hand in his pocket that maybe there

10  was something in there that he shouldn't have.

11      Q     Next, what happened next?

12      A     He turned -- pulled away again to his right,

13  but this time I was holding the outside of his

14  shoulders and he went down to his knees.  And I reached

15  down again to search that pocket, and that's when I saw

16  that he had some blood dripping from his face.  I

17  turned and looked at him.  He had a bloody nose.  Then

18  he became very upset.  He started screaming and yelling

19  and slid right down onto his belly onto the floor.  I

20  was standing over him at this point.  And then he

21  started smacking his right hand into the blood on the

22  floor.  And he was reaching around trying to grab me

23  with his hand.  He was screaming and yelling pretty

24  good right now.  That's when Dave and -- Officer

25  Perrotti and Officer Demarco came into the doorway.

1   And I asked Officer Demarco to get me some gloves and

2   gauze.  He did.

3        Q     Okay.  Let me just stop you there for a

4   minute.  I thought you said that Demarco got off the

5   shift at eleven.  What was he doing there?

6        A     Finishing his reports.  He was in the squad

7   room.

8        Q     What time was it now?

9        A     After 12:30.

10        Q     Now, did you offer a Breathalyzer test to

11   the plaintiff?

12        A     Not yet.

13        Q     Okay.  Tell me --

14              (Attorney Titus takes Attorney

15              Gerarde's place in the deposition.)

16        Q     So what time was it that Demarco -- you're

17   saying Demarco was in another room?

18        A     Yeah.  The squad room.  It's right off --

19   the dispatch center and interview room are like a

20   straight line.  They're probably like 15 feet apart or

21   so, and it's off to the left of them is the squad room.

22        Q     And Demarco came in at what point?

23        A     Actually, they both came to the door at the

24   same time.

25        Q     By "both," who do you mean?

 1       A       Officer Perrotti and Officer Demarco both

 2  came to the doorway after Mr. Hogfeldt slipped down and

 3  was yelling and screaming.  He was yelling something

 4  about putting his blood on me.

 5       Q       Then what happened?

 6       A       Officer Demarco went and got me some gloves

 7  and a gauze and Officer Perrotti went back to the desk.

 8       Q       Then what happened?  Why did you have

 9  gloves, by the way?

10       A       The rubber gloves, latex gloves?

11       Q       Yeah.

12       A       Because he was bleeding.

13       Q       I thought you said there was just a little

14  bit of blood coming out of his nose?

15       A       Yeah.  He had a bloody nose.

16       Q       How bad was it?

17       A       Pretty good.  It was enough to go on the

18  floor.  I don't remember exactly, but it was bleeding

19  pretty good.

20       Q       And you're saying that happened how again?

21       A       When he was facing the wall and I tried to

22  reach into his right front pocket.

23       Q       So in other words, the injuries in this case

24  resulted because the plaintiff fell down?  That's your

25  testimony?

1      A      He didn't fall down.  He just pulled away

2  from me and went -- literally didn't ever fall to the

3  ground, was still standing, was right into the wall.

4      Q      Are you aware of the injuries?

5      A      No, sir.

6      Q      Are you aware of the fact that the plaintiff

7  suffered a hematoma to the frontal lobe of his brain?

8      A      No, sir.  I wasn't aware of that.

9      Q      Were you aware that he suffered four broken

10  ribs?

11      A      No, sir.

12      Q      Are you aware that he suffered a hernia that

13  requires him to this day to wear a hernia support?

14      A      No, sir.

15      Q      Are you aware that he had a broken arm?

16      A      No.

17      Q      Are you aware that his eye was injured so

18  badly that to this day he has problems with his vision?

19      A      No.

20      Q      Were you aware that his nose was broken?

21      A      I knew it was injured.  I didn't know it was

22  broken.

23      Q      And you're saying that all that happened

24  because -- well, in your testimony he didn't even fall

25  down; he just, what, sort of crumbled to the floor?

1  minutes, just enough to get the paperwork together.

2       Q      Was Demarco with him at that time?

3       A      No.  He was in the interview room alone.

4       Q      When did Demarco leave?

5       A      I don't know exactly.

6       Q      Well, approximately when?

7       A      Sometime after then.  I couldn't say

8  exactly, I don't remember.  But, like I said, he was

9  just there doing reports.  Whenever he completed his

10  reports, I guess he would have left.

11       Q      Now, at some point you conducted a -- well,

12  let me ask it:  At some point did you offer a

13  Breathalyzer to the plaintiff?

14       A      Yes, sir.

15       Q      When was that?

16       A      After I took him out of that first interview

17  room and brought him into the second interview room.

18  That's after, you know, the bleeding, the bloody nose

19  had stopped.  He was pretty upset.  He was crying.  He

20  was saying like he had family in law enforcement, and

21  he was apologizing.  We talked in that interview room

22  for maybe ten minutes or so.  That's when I explained

23  to him what was going to happen, there was no need to

24  be this upset.  I explained that I was going to read

25  him the rights and offer him the Breathalyzer test.  I

1   reviewed what the paperwork was for him.  That's when I

2   would have left the interview room, got the paperwork

3   and I would have brought him out to the back counter.

4           ATTORNEY SPINELLA:  Let's get this

5       marked.

6           (Plaintiff's Exhibit No. 6, refusal of

7               test, was marked for identification.)

8       Q    Did the plaintiff request to talk to an

9   attorney at any time?

10      A    No, sir.

11      Q    No?

12      A    No, sir.

13      Q    Are you sure about that?

14      A    Yes, sir.

15      Q    Doesn't it say on the A-44 that he was

16  afforded a reasonable opportunity to telephone his

17  attorney --

18      A    Yes, sir.

19      Q    -- and he declined?

20      A    Yes, sir.

21      Q    Well, it doesn't say declined.  It just says

22  that he was offered a reasonable opportunity, correct?

23      A    It's in my report that he declined.

24      Q    Does it say that on the A-44?

25      A    No.  It just asks if he was apprised of his

73

```
 1                  C E R T I F I C A T E

 2

 3        I hereby certify that I am a Notary Public, in and

 4   for the State of Connecticut, duly commissioned and

 5   qualified to administer oaths.

 6        I further certify that the deponent named in the

 7   foregoing deposition was by me duly sworn, and

 8   thereupon testified as appears in the foregoing

 9   deposition; that said deposition was taken by me

10   stenographically in the presence of counsel and reduced

11   to typewriting under my direction, and the foregoing is

12   a true and accurate transcript of the testimony.

13        I further certify that I am neither counsel nor

14   attorney to either of the parties to said suit nor

15   related to or employed by either counsel in said suit

16   nor am I interested in the outcome of said cause.

17        Witness my hand and seal as Notary Public

18   this _____ day of _____ 20 ____.

19

20

21

22                        _____
                                Notary Public
23
                          Connecticut License No. 00181
24                        My commission expires:
                          November 30, 2004
25
```

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KARL HOGFELDT | : | NO.:  3:01CV1979 (WWE) |
| | : | |
| v. | : | |
| | : | |
| OLD SAYBROOK POLICE DEPARTMENT | : | |
| SERGEANT DONALD HULL; PATROLMAN | : | |
| DAVID PERROTTI; PATROLMAN CHRIS | : | |
| DEMARCO; PATROLMAN JAY RANKIN; | : | |
| EACH INDIVIDUALLY AND AS POLICE | : | |
| OFFICERS AND MEMBERS OF THE OLD | : | |
| SAYBROOK POLICE DEPARTMENT; AND | : | |
| THE TOWN OF OLD SAYBROOK | : | FEBRUARY 17, 2003 |

**A F F I D A V I T**

I, Patrolman Chris Demarco, being duly sworn, depose and say:

1.      I am over eighteen years of age;

2.      I understand the obligations of an oath;

3.      I am a patrolman with the Old Saybrook Police Department;

4.      At some point the evening of October 22, 1999, I left my desk to assist Sergeant Hull, who was processing Mr. Hogfeldt;

5.      At this time, Mr. Hogfeldt was yelling, screaming, and uncooperative;

6.      I noticed that Mr. Hogfeldt had a nose injury;

# Exhibit E

7.      Mr. Hogfeldt had to be held down at this point;

8.      I did not witness how Mr. Hogfeldt injured his nose, as I was off duty and at

my desk completing paperwork, before assisting Sergeant Hull.


        Dated at Old Saybrook, Connecticut, this 18th day of February, 2003.



                                        /s/ Pltm. Chris DeMarco
                                        Patrolman Chris DeMarco


STATE OF CONNECTICUT            )
                                ) ss:  Old Saybrook
COUNTY OF MIDDLESEX             )

        Subscribed and sworn to before me this 18th day of February, 2003.



                                        /s/ Daniel C. DeMerchant
                                        Commissioner of the Superior Court
                                        ~~Notary Public~~
                                        ~~My commission expires:~~