1

```
 1            UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF CONNECTICUT
 2

 3   * * * * * * * * * * * * * * * *
                                   *
 4   KARL HOGFELDT,                *
                   PLAINTIFF,      *  CIVIL ACTION NO.
 5                                 *  3:01 CV 1979 (WWE)
     VS.                           *
 6                                 *
     OLD SAYBROOK POLICE DEPARTMENT, *
 7   SERGEANT DONALD HILL,         *
     PATROLMAN DAVID PERROTTI,     *
 8   PATROLMAN CHRIS DEMARCO,      *
     PATROLMAN JAY RANKIN,         *
 9   EACH INDIVIDUALLY AND AS      *
     POLICE OFFICERS AND MEMBERS   *
10   OF THE OLD SAYBROOK POLICE    *
     DEPARTMENT; AND THE TOWN OF   *
11   OLD SAYBROOK OF OLD SAYBROOK, *
                                   *
12              DEFENDANTS.        *
                                   *
13   * * * * * * * * * * * * * * * *

14

15   -------------------------------------------------------
            DEPOSITION OF:  PATROLMAN CHRIS DEMARCO
16   -------------------------------------------------------

17

18            Taken before Carol C. Schindler, CSR,
     No. 38, Stenographer and Notary Public licensed by
19   the State of Connecticut, pursuant to the Federal
     Rules of Civil Procedure, at the law offices    of
20   Spinella & Associates, One Lewis Street, Hartford,
     Connecticut, on September 17, 2003, commencing at
21   12:30 p.m.

22

23         GORDON & ASSOCIATES REPORTING SERVICE
                      P.O. Box 47
24              Middlefield, CT  06455
                  Tel:  (860) 347-6204
25                  FAX:  (860) 347-6536
```

# Exhibit F

DeMarco        2

```
 1                      APPEARANCES

 2

 3           SPINELLA & ASSOCIATES
             A. Paul Spinella, Attorney at Law
 4           One Lewis Street
             Hartford, CT  06103
 5
                          Representing the Plaintiff
 6
             HOWD & LUDORF
 7           John J. Radshaw, Attorney at Law
             65 Wethersfield Avenue
 8           Hartford, CT  06114-1190

 9                        Representing the Defendant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

GORDON & ASSOCIATES

DeMarco        3

1                       STIPULATIONS

2

3        IT IS STIPULATED by the attorneys for the

4   Plaintiff and the Defendants that each party reserves

5   the right to make specific objections in open court

6   to each and every question asked and the answers

7   given thereto by the witness, reserving the right to

8   move to strike out where applicable, except as to

9   such objections as are directed to the form of the

10  question.

11

12       IT IS STIPULATED and agreed between counsel for

13  the parties that the proof of the authority of the

14  Notary Public before whom this deposition is taken is

15  waived.

16

17       IT IS FURTHER STIPULATED and agreed that the

18  reading and signing of this deposition are not waived

19  and any defects in the Notice are waived.

20

21

22

23

24

25

GORDON & ASSOCIATES

DeMarco        17

```
 1          absolutely and totally irrelevant to this
 2          case.  You are free to inquire on what
 3          Officer DeMarco was doing at the station at
 4          11:30, but I don't think any further
 5          inquiry of LaPlace is warranted or
 6          reasonable.
 7              MR. SPINELLA:  I don't think that your
 8          objection is well taken as relevant.
 9          Certainly it is relevant, but the fact that
10          the lawsuit is pending, I guess I'm not
11          going to press it.  I will just move on.
12 BY MR. SPINELLA:
13 Q   Let me ask you about the time that you were in
14     the police department after 11:00.  Were you
15     situated in a certain place in the department,
16     I mean, did you confine your movement to a
17     certain area?
18 A   Yes.  I was in what we call the squad room,
19     which is where all the report writing takes
20     place.
21 Q   Were you in the squad room for that entire
22     period?
23 A   Yes.  Aside from what happened later in the
24     evening.
25 Q   Now at some point Sergeant Hull came into the
```

GORDON & ASSOCIATES

DeMarco        18

1        police department with Karl Hogfeldt, correct?

2    A   Correct.

3    Q   Now did you see them enter the department?

4    A   Yes.

5    Q   Why is that?  I thought you were in the squad
6        room, they call it?

7    A   It's called the squad room, which is adjacent
8        to the dispatch area.

9    Q   So you saw him do what, take Karl Hogfeldt
10       where?

11   A   Walk in via the garage and place him in the
12       interview room.

13   Q   The garage, he didn't come in through the front
14       door?

15   A   No.  Prisoners are taken into the garage, which
16       serves as the salliport (phonetic).

17   Q   Is that the back entrance?  Is that a back
18       entrance?

19   A   It's on the side of the building.  If you are
20       facing the front, you drive in the side
21       driveway, and the garage is on the side of the
22       building.

23   Q   So you would have saw Hogfeldt as he was being
24       brought into conference room 1?

25   A   Interview room, yes.

GORDON & ASSOCIATES

DeMarco        19

1   Q   And there was a map of the conference room that
2       was drawn previously by Officer Perrotti that
3       shows that the squad room door opens to the
4       hallway adjoining conference room 1; is that
5       correct?  Would that be the layout?
6   A   Well, the dispatch area is a big square, so to
7       speak, with a conference room, which we call
8       the interview room, there is two interview
9       rooms, which if you are in the doorway of the
10      interview rooms looking out, you are looking on
11      the dispatch area.
12  Q   Can you also see the squad room door?
13  A   You can see the door, it's at an angle to your
14      left.  If you are facing out of the interview
15      room, to your left would be the entrance to the
16      squad room.
17  Q   So how did it come about that you saw them
18      enter conference room 1?  Were you standing in
19      the doorway?
20  A   I heard over the radio, obviously, the dispatch
21      radio is there, that Sergeant Hull was on route
22      to the headquarters with a prisoner.
23  Q   What time was that, by the way?
24  A   My recollection is 12:30 a.m.
25  Q   That is when you heard that he was on route?

GORDON & ASSOCIATES

DeMarco        20

1  A    Somewhere in that area, yes.

2  Q    So then what happened vis-a-vis Hogfeldt?

3  A    He walked Hogfeldt in, placed him in the

4       interview room.

5  Q    Let's stop there for a minute.  You were in the

6       doorway of the squad room to see this when he

7       walked in, why is that?

8  A    I was seeing who the prisoner was that he was

9       bringing in.

10  Q    You were just curious?

11  A    Yes.

12  Q    What did you see?

13  A    I saw Sergeant Hull walk Hogfeldt into the

14       interview room, I then turned around and went

15       back to my computer and continued working on my

16       report.

17  Q    Then what happened?

18  A    A short time later --

19  Q    A short time, how long?

20  A    Estimating ten minutes, five to ten minutes.

21  Q    Could it have been longer?

22  A    I don't believe so, it was a short time.

23  Q    Could it have been longer than ten minutes?

24  A    I don't believe so.

25  Q    It might have been?

GORDON & ASSOCIATES

DeMarco      21

1  A    I don't believe so.  My best guess is that it

2       was a very short time, between five and ten

3       minutes.

4  Q    Then what?

5  A    Then Sergeant Hull was yelling for assistance.

6       There was a commotion, he was asking for gloves

7       and paper towels.

8  Q    Now when you heard him yell -- well, let's

9       start with what he said.  What did you hear him

10      yell?

11 A    Something to the effect, Guys, I need some

12      paper towels and gloves, yelling out to Officer

13      Perrotti, who was at the dispatch, or myself,

14      or anyone else who was in the building.

15 Q    Going back to when you first saw Hogfeldt being

16      brought into conference room 1, was he injured

17      in any way?

18 A    No.

19 Q    Did he have a broken nose?

20 A    Not that I know of.

21 Q    Four broken ribs?

22 A    I don't know.  I never got that close to him to

23      inspect or ask him if he was injured?

24 Q    Broken arm?

25 A    Not to my knowledge.

GORDON & ASSOCIATES

DeMarco    22

1  Q   Injury to his head so severe that it might have
2      caused a hematoma to the frontal lobe of his
3      brain?
4  A   I don't know.
5  Q   Facial fracture?
6  A   Don't know.
7  Q   Well, did you see anything that appeared like
8      any of that?
9  A   No.  There was nothing unusual about it.  It
10     was just another prisoner that walked into the
11     interview room as was practice.
12 Q   Was he handcuffed at the time?
13 A   I believe he was, yes.
14 Q   What did you hear Officer Hull yell again?
15 A   That he needed -- I don't know the exact words,
16     but something to the effect that he needed
17     gloves and paper towels.
18 Q   Anything else?
19 A   No.
20 Q   Hear Hogfeldt yell at all?
21 A   No.  There was a commotion that I couldn't
22     decipher definitive words, it was just the
23     commotion and Sergeant Hull asking for gloves
24     and paper towels.
25 Q   When you say "commotion," what do you mean by

GORDON & ASSOCIATES

DeMarco        23

1       that?

2   A   Some sort of verbal commotion.

3   Q   Did it sound like people struggling, anything

4       of that sort?

5   A   Just yelling.

6   Q   Just yelling?

7   A   People yelling.

8   Q   Was Hogfeldt yelling?

9   A   I don't know, there was just a noise from the

10      interview room and Sergeant Hull asking for

11      gloves and paper towels.

12  Q   So you came out when you heard the yelling,

13      when you heard Sergeant Hull asking for these

14      things.  What did you see when you came out of

15      the squad room?

16  A   When I got to the area of the opening of the

17      interview room, I saw Sergeant Hull in there

18      with Hogfeldt.

19  Q   What did you see?

20  A   Hogfeldt was on the ground face down.

21  Q   Handcuffed?

22  A   No.  Sergeant Hull was standing over him trying

23      to control Hogfeldt.

24  Q   Control him, what do you mean?

25  A   If you haven't seen the room, I suppose it is

GORDON & ASSOCIATES

DeMarco        24

1        more difficult for you to visualize it, but

2        it's extremely small, cement cinder block room

3        with chairs and table in a very limited

4        room.  So Hogfeldt was on the ground, and

5        Sergeant Hull was attempting to control him,

6        physically control him from squirming around,

7        getting up.  Hogfeldt had blood coming from his

8        nose.  He was placing his hands in the blood.

9    Q   Was he lying on the floor?

10   A   Yes.  He was wiping his hands in the blood and

11       attempting to reach around and wipe blood on

12       Sergeant Hull, hence, the need for gloves and

13       paper towels.

14   Q   But did you see him touch Hull with the

15       bloodied hand?

16   A   I don't know if he made contact or not, maybe

17       on his pants, but he was attempting to wipe the

18       blood on him.

19   Q   Did he say that he was trying to wipe blood on

20       him?

21   A   I don't think he said that specifically, he was

22       just intoxicated and yelling.

23   Q   So you didn't see him wipe blood on him, he

24       didn't say that he was wiping blood on him, but

25       it's your conjecture that that is what he was

GORDON & ASSOCIATES

DeMarco      25

1       trying to do?

2                   MR. RADSHAW:   Object to the form of

3              the question.

4   BY MR. SPINELLA:

5   Q    You can answer.

6   A    My observation was that he was wiping his hand

7              in the blood.

8   Q    Didn't you just testify, Officer, that he did

9              not wipe his bloodied hand on his shirt?

10  A    I think I said I don't know if he wiped the

11             blood on the shirt or not.

12  Q    I think you said he did not.  So my question

13             is, if he did not wipe his hand on the shirt,

14             and he did not say that he was trying to, isn't

15             it just conjecture on your part that, in fact,

16             he was attempting to do that?

17                  MR. RADSHAW:   Object to the form of

18             the question.  You can answer.

19  A    My observation was that he was wiping his hand

20             in blood and reaching back in what I clearly

21             interpreted as an attempt to wipe blood on

22             Sergeant Hull.  Where he was trying to wipe it,

23             I have no idea.

24  BY MR. SPINELLA:

25  Q    What did you do next, if anything?

GORDON & ASSOCIATES

DeMarco        26

1   A   I simply stood outside the door while

2       Sergeant Hull was given the paper towels and

3       gloves, and he also needed an ice pack.

4   Q   Who got those for him?

5   A   I got the ice pack.

6   Q   Who got the paper towels?

7   A   I believe Officer Perrotti.

8   Q   Where was he coming from?

9   A   Dispatch, which was across from the interview

10      room.

11  Q   You got an ice pack?

12  A   Correct.

13  Q   Did he ask you to get an ice pack?

14  A   I believe he did.  That would be standard for a

15      nose injury, to put an ice pack on it.

16  Q   Then what happened?

17  A   After he was under control?

18  Q   What do you mean "under control"?

19  A   After things calmed down, gloves were on, blood

20      was wiped up, Hogfeldt had paper towels on his

21      nose and the ice pack, I returned to the squad

22      room to finish my report.

23  Q   Did Hogfeldt try to -- you say "under control,"

24      was he trying to strike somebody during this

25      time?

GORDON & ASSOCIATES

DeMarco        38

1   Q   Just taped over?

2   A   Yes.

3   Q   Was it saved for the Hogfeldt arrest; do you

4       know?

5   A   Just, as far as I know, a 30-day cycle.

6           MR. SPINELLA:  Okay, nothing further.

7       Thank you.

8           MR. RADSHAW:  Officer DeMarco, I have

9       a couple of questions for you.

10

11      CROSS EXAMINATION BY MR. RADSHAW

12

13  Q   Attorney Spinella has covered most of those

14      questions, but I just want to go over a couple

15      of them in detail.  On October 21, 1999, you

16      worked the 3:00 to 11:00 shift; is that right?

17  A   Correct.

18  Q   After 11:00 on the night of the 21st of October

19      until the time you say you left the department

20      on the morning of the 22nd, you were at the

21      Old Saybrook police headquarters; is that

22      right?

23  A   Yes.

24  Q   So you were not on the road at any time after

25      11:00 p.m. to the time you left in uniform in a

GORDON & ASSOCIATES

DeMarco        39

1        police cruiser; is that right?

2    A    That is correct.

3    Q    You did not participate in any way the motor

4        vehicle stop of Karl Hogfeldt at or around

5        midnight between the 21st and 22nd of October?

6    A    I did not.

7    Q    At the time you went over to Sergeant Hull and

8        Karl Hogfeldt in interview room 1, you didn't

9        touch Karl Hogfeldt at any time, did you?

10   A    No.  I stood outside the doorway.

11   Q    Just a little bit about standard operating

12       procedure and blood borne pathogens.  Why is it

13       so important to be concerned about blood borne

14       pathogens?

15   A    For the simple reason of the transference of

16       disease and the risk, whether it be AIDS or

17       hepatitis.  We receive a lot of training on

18       that, and, obviously, that is paramount in our

19       dealings with people.

20   Q    So it is not just AIDS or HIV; is that right?

21   A    Correct.

22   Q    There are a whole number, a host of diseases

23       and problems that you can get with blood; is

24       that right?

25   A    That is correct.

GORDON & ASSOCIATES

DeMarco        43

```
 1              CERTIFICATE OF REPORTER

 2       I, Carol C. Schindler, a Notary Public duly

 3  commissioned and qualified in and for the State of

 4  Connecticut, do hereby certify that pursuant to

 5  Notice, there came before me, on the 17th day of

 6  September, 2003, the following named person, to wit:

 7  PATROLMAN CHRIS DEMARCO, who was by me duly sworn to

 8  testify to the truth and nothing but the truth; that

 9  he was thereupon carefully examined upon his oath and

10  his examination reduced to writing under my

11  supervision; that this deposition is a true record of

12  the testimony given by the witness.

13       I further certify that I am neither attorney nor

14  counsel for, nor related to, nor employed by any of

15  the parties to the action in which this deposition is

16  taken, and further, that I am not a relative or

17  employee of any attorney or counsel employed by the

18  parties hereto, or financially interested in the

19  action.

20       IN WITNESS THEREOF, I have hereunto set my hand

21  and affixed my seal this 29th day of September, 2003.

22

23                     _____
                       Carol C. Schindler, CSR, No. 38
24                     Notary Public

25  My Commission expires:  May 31, 2006
```

GORDON & ASSOCIATES

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KARL HOGFELDT | : | NO.: 3:01CV1979 (WWE) |
| | : | |
| v. | : | |
| | : | |
| OLD SAYBROOK POLICE DEPARTMENT | : | |
| SERGEANT DONALD HULL; PATROLMAN | : | |
| DAVID PERROTTI; PATROLMAN CHRIS | : | |
| DEMARCO; PATROLMAN JAY RANKIN; | : | |
| EACH INDIVIDUALLY AND AS POLICE | : | |
| OFFICERS AND MEMBERS OF THE OLD | : | |
| SAYBROOK POLICE DEPARTMENT; AND | : | |
| THE TOWN OF OLD SAYBROOK | : | FEBRUARY 17, 2003 |

**A F F I D A V I T**

I, Patrolman David Perrotti, being duly sworn, depose and say:

1.      I am over eighteen years of age;

2.      I understand the obligations of an oath;

3.      I am a patrolman with the Old Saybrook Police Department;

4.      On October 22, 1999, I was working at the police department front desk;

5.      At some point that evening, I left the front desk to assist Sergeant Hull, who was processing Mr. Hogfeldt;

6.      At this time, Mr. Hogfeldt was yelling, screaming, and uncooperative;

Exhibit G

7.      Mr. Hogfeldt had a nose injury at this time;

8.      Mr. Hogfeldt had to be held down at this point.


Dated at Old Saybrook, Connecticut, this 18th day of February, 2003.


/s/ Ptlm. David Perrotti
Patrolman David Perrotti


STATE OF CONNECTICUT            )
                               ) ss:  Old Saybrook
COUNTY OF MIDDLESEX             )

Subscribed and sworn to before me this 18th day of February, 2003.


/s/ Daniel C. DeMerchant
Commissioner of the Superior Court
~~Notary Public~~
~~My commission expires:~~

1

```
 1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF CONNECTICUT
 2

 3   * * * * * * * * * * * * * * * *
                                  *
 4   KARL HOGFELDT,               *
                 PLAINTIFF,       *   CIVIL ACTION NO.
 5                                *   3:01 CV 1979 (WWE)
     VS.                          *
 6                                *
     OLD SAYBROOK POLICE DEPARTMENT, *
 7   SERGEANT DONALD HILL,        *
     PATROLMAN DAVID PERROTTI,    *
 8   PATROLMAN CHRIS DEMARCO,     *
     PATROLMAN JAY RANKIN,        *
 9   EACH INDIVIDUALLY AND AS     *
     POLICE OFFICERS AND MEMBERS  *
10   OF THE OLD SAYBROOK POLICE   *
     DEPARTMENT; AND THE TOWN OF  *
11   OLD SAYBROOK OF OLD SAYBROOK, *
                                  *
12              DEFENDANTS.       *
                                  *
13   * * * * * * * * * * * * * * * *

14

15   ------------------------------------------------------
            DEPOSITION OF:  PATROLMAN DAVID PERROTTI
16   ------------------------------------------------------

17

18           Taken before Carol C. Schindler, CSR,
     No. 38, Stenographer and Notary Public licensed by
19   the State of Connecticut, pursuant to the Federal
     Rules of Civil Procedure, at the law offices of
20   Spinella & Associates, One Lewis Street, Hartford,
     Connecticut, on September 17, 2003, commencing at
21   10:40 a.m.

22

23         GORDON & ASSOCIATES REPORTING SERVICE
                      P.O. Box 47
24               Middlefield, CT  06455
                  Tel:  (860) 347-6204
25                FAX:  (860) 347-6536
```

Exhibit H

Perrotti      12

```
 1        operated as a patrolman with patrolman duties.

 2        Do you do anything else?

 3   A    Bicycle patrol.

 4   Q    Anything else?

 5   A    You name it, we do it, sir.  I mean --

 6   Q    How many people -- I am sorry, go ahead.

 7   A    Under patrol, I mean you do everything.  I

 8        mean, I don't know how to classify it.

 9   Q    How many people on the department?

10   A    Twenty-two maybe now, maybe even less than

11        that, including the chief and deputy.

12   Q    All right, now let me direct your attention

13        to the date of issue here, that would be

14        October 22, 1999.  Were you on duty that day,

15        or in the early -- let's see, were you on duty

16        on the 21st or the 22nd?

17   A    I was on the 11:00 p.m. to 7:00 a.m. shift.

18   Q    11:00 p.m. on October 21 to 7:00 a.m. on

19        October 22?

20   A    Yes.

21   Q    What were you doing?  What were your duties?

22   A    On that shift, I was the dispatcher.

23   Q    What does that mean?

24   A    You answer the telephones, send officers to

25        calls, 911 emergency, dispatch EMS.
```

GORDON & ASSOCIATES

Perrotti    13

1  Q    So you sit at a desk for the entire shift?

2  A    Yes, sir.

3  Q    How is the department laid out?  Tell me, when

4       I walk in, what would I see, and where is your

5       desk located?

6  A    When you walk in the door you will see -- you

7       walk into the lobby, and directly in front of

8       you is a glass partition that you can see

9       through, a clear plexiglass.  And the dispatch

10      center is right there.  My chair, the

11      dispatcher seat is right there.  So when you

12      come in you are face to face with the

13      dispatcher, the communications officer.

14 Q    Tell me how the rest -- let's say a police

15      office comes in with an arrestee, where does he

16      take him?

17 A    Into interview 1 or 2, which would be located

18      to your left-hand side.

19 Q    Can you just draw -- do you mind drawing a

20      little map to show the layout?

21          MR. RADSHAW:  For the record, this

22        sketch is approximate and not to scale.

23

24               (Witness complies.)

25

GORDON & ASSOCIATES

Perrotti    14

1  A      You want the whole layout?  The squad room, the

2         detective's office?

3  BY MR. SPINELLA:

4  Q      Yeah.

5

6                        (Witness complies.)

7

8              MR. SPINELLA:  Can we get that marked?

9

10                       (Plaintiff's Exhibit No. 1,

11                        diagram,

12                        marked for identification.)

13

14 BY MR. SPINELLA:

15 Q      Now, so you went on duty at 11:00.  And you

16        stayed in the communications center for that

17        entire period?  In other words, you did not go

18        out on the road?

19 A      Correct.

20 Q      But would you have gone to different parts of

21        the department during that eight-hour shift?

22 A      Yes, sir.

23 Q      Where?

24 A      Rest room.

25 Q      Where else?

GORDON & ASSOCIATES

Perrotti     15

```
 1  A    Squad room, and also downstairs.  And I didn't
 2       write in the downstairs, but this is
 3       the downstairs that has a training room where
 4       we go down and eat.
 5  Q    What is in the squad room?
 6  A    Computers and our drawers where we keep all of
 7       our files.  That is where the patrolman do
 8       their reports, it's in the squad room.
 9  Q    Did you -- prior to October 21, 1999, had you
10       ever met Karl Hogfeldt?
11  A    No, sir.
12  Q    Did you know anything about him?
13  A    No, sir.
14  Q    Did you know Officers DeMarco and Hull?
15  A    Yes, sir.
16  Q    How well?
17  A    I was a year ahead of Sergeant Hull in high
18       school, so I've known him through high school.
19       Chris DeMarco, he is just like myself, we
20       started employment with Old Saybrook, we work
21       together.
22  Q    Are you friendly with both of them?
23  A    On a working basis, yes.
24  Q    Tell me who, between the hours of 11:00 and
25       7:00, was working that night?
```

Perrotti     16

1  A    Sergeant Hull.  On the shift, I believe it was

2        Officer Rankin until 4:00, from 11:00 to 4:00

3        a.m., myself, and I am not sure who came in to

4        replace Officer Rankin at 400.

5  Q    Did you see Officer DeMarco at all that night?

6  A    Yes.

7  Q    That was my question, who was on duty?

8  A    Officer DeMarco was in the squad room doing a

9        driving while intoxicated report in the squad

10       room.

11  Q    I don't understand, he wasn't on duty, but he

12       was present, is that what you are saying?

13  A    Yes, sir.

14  Q    Let me rephrase the question:  What police

15       officers were present, either on duty on the

16       road between the hours of 11:00 and 7:00 a.m.,

17       or present physically on the police department

18       premises, on the premises, during that period,

19       whether on duty or not?

20  A    In the department was Sergeant Hull, Patrolman

21       DeMarco, and myself.  And then Patrolman Rankin

22       would be on the road, because Patrolman Rankin

23       never came inside of the station.

24  Q    So you didn't see Rankin that night?

25  A    No, sir.

GORDON & ASSOCIATES

Perrotti     17

1   Q    You saw DeMarco?

2   A    Yes, sir.

3   Q    When did you see DeMarco?

4   A    When I came in from my 2300 -- 11:00 p.m.

5        shift.

6   Q    And how long was DeMarco on the premises?

7   A    I am not sure when --

8   Q    Approximately?

9   A    -- when he left.  I would have to say maybe to

10       3:00 to 4:00 a.m.

11   Q    3:00 to 4:00 a.m.?

12   A    From 11:00 p.m. to maybe about 3:00.  I can't

13       give you a time.

14   Q    I understand.  But so, in other words, he was

15       not on duty during that time, but he just came

16       in to, what, catch up on work?

17   A    What happens is Officer DeMarco was working the

18       3:00 p.m. to 11:00 p.m. shift.  He made a DWI

19       arrest.  I am not sure of the name of the

20       arrest.  And you have to get the report done.

21       I don't know if Officer DeMarco was off the

22       next couple of days, because you only have the

23       72 hours to get it to DMV, so when that occurs

24       you stay and do the report.

25   Q    And it can take that long till 3:00 in the

GORDON & ASSOCIATES

Perrotti     23

1   BY MR. SPINELLA:

2   Q     You can answer.

3   A     I am not sure if the name was put over the

4         air, or if I ran license information for

5         Sergeant Hull, which would be done through the

6         Department of Motor Vehicles.

7

8                         (Off-the-record discussion.)

9

10  BY MR. SPINELLA:

11  Q     When you get a call from an officer -- let's

12        say an officer in the field makes an arrest,

13        doesn't he communicate that to the dispatcher

14        or the headquarters in some way?

15  A     We will call in one in custody for a 115 for a

16        227A, which is a DWI arrest.

17  Q     That is what I mean, he will make a call in,

18        correct?

19  A     Yes, sir.

20  Q     When would that call occur?

21  A     After the field sobriety test.

22  Q     Wouldn't it occur at the point that the stop

23        was being made?

24  A     No, you wouldn't call in with someone under

25        arrest when you make the stop, you would call

GORDON & ASSOCIATES

Perrotti      24

1          in the marker plate and the location of the

2          motor vehicle stop, yes.

3     Q    That is what I am asking you.  When a police

4          officer determines that a stop is about to be

5          made, or immediately after a stop has been

6          made, isn't a call made into the police

7          department at that point to advise them about

8          what is occurring?

9     A    Yes.  We call in a motor vehicle stop and

10         location.

11    Q    That is what my question is.  So didn't you get

12         a call in this case from Officer Hull at the

13         point that a stop was being made?

14    A    I believe so, yes, sir.

15    Q    Do you have any independent recollection of

16         that?

17    A    Yes, sir.

18    Q    Do you know what time that was?

19    A    Somewhere around midnight.

20    Q    Do you remember what was said?

21    A    No, sir.

22    Q    Now, was there more than one call made from

23         Officer Hull in the field to you about what was

24         occurring?  In other words, there was a call

25         when the stop was made?  Was there any

GORDON & ASSOCIATES

Perrotti     43

1  Q     To who?

2  A     To us, for help.

3  Q     Where was DeMarco while this was taking place?

4  A     Squad room.

5  Q     Was he the only other police officer there?

6  A     Yes, sir.

7  Q     Were there any other non-police officers in the

8        building?  Any other human beings, in other

9        words.

10 A     At that time, no.

11 Q     What about that night, or that morning?

12 A     Yes, sir.  Yes, there was others.

13 Q     Who?

14 A     Whoever came to pick up Mr. Hogfeldt.  There

15       was a male and a female.

16 Q     Anybody else?

17 A     Newspaper people.

18 Q     Newspaper people, what do you mean?  There was

19       a reporter there?

20 A     The Hartford Courant, and The Day.  The

21       newspapers are delivered every seven days a

22       week, 365 days a year.

23 Q     The paper delivery boy, who else?  Was anybody

24       else there?

25 A     That, I can't answer.

GORDON & ASSOCIATES

Perrotti    44

1  Q   What time were the papers delivered?

2  A   Anywhere from 4:00 a.m., depending on what

3      edition is running.  It could be between

4      4:00 --

5  Q   Do you remember what time that morning they

6      were delivered?

7  A   No, sir.

8  Q   Were they the only other non-police officers

9      that were present that morning?

10 A   I believe so.

11 Q   So he says, Come here, come here, you and

12     DeMarco go to your doors, or you go to the

13     interrogation room.  Then what happens?

14 A   Sergeant Hull told us he wanted gloves and

15     paper towels, and Mr. Hogfeldt was on the

16     floor, there was blood, and Mr. Hogfeldt was

17     reaching with his right hand into the blood and

18     trying to reach up over to get it onto

19     Sergeant Hull.

20 Q   Do what to Sergeant Hull?

21 A   To get blood on his white shirt, because

22     Sergeant's wear white shirts.

23 Q   Uh-huh.

24 A   I ran and got gloves --

25 Q   Wait a minute.  Hogfeldt was lying on the

GORDON & ASSOCIATES

Perrotti     68

1   A   Because I notarized this report.

2   Q   But, I mean, did you review it at any time

3       after that?

4   A   No, sir.

5           MR. SPINELLA:  No questions.

6

7           CROSS EXAMINATION BY MR. RADSHAW

8

9   Q   Officer Perrotti, I just have a few questions

10      for you.  Attorney Spinella covered most of

11      these in his Direct Examination of you.  At the

12      time you came over to interview 1 and saw

13      Sergeant Hull and Mr. Hogfeldt, did you touch

14      Mr. Hogfeldt at any time?

15  A   No, sir.

16  Q   You went and you said you got latex gloves and

17      paper towels; is that right?

18  A   Yes, sir.

19  Q   And you went and you gave them back to

20      Sergeant Hull; is that correct?

21  A   Yes, sir.

22  Q   During that entire period of time, you didn't

23      touch Mr. Hogfeldt?

24  A   Correct, I did not touch him.

25  Q   You didn't have any personal contact with him

GORDON & ASSOCIATES

Perrotti    69

1       at any time he was in the police station, and

2       what I mean by personal contact, I mean

3       physical touching; is that right?

4   A   That is correct.

5   Q   And when Mr. Hogfeldt's car was stopped that

6       night, you didn't participate in any way

7       because you weren't at that motor vehicle stop,

8       were you?

9   A   No, sir.

10  Q   You were at the Old Saybrook Police Department

11      the entire time; is that right?

12  A   Yes, sir.

13          MR. RADSHAW:  I have no further

14      questions.

15

16                  (Deposition concluded

17                   at 12:03 p.m.)

18

19

20

21

22

23

24

25


GORDON & ASSOCIATES

Perrotti    71

1              CERTIFICATE OF DEPONENT

2         I, PATROLMAN DAVID PERROTTI, do hereby
         certify that the foregoing testimony is true
3        and accurate to the best of my knowledge and
         belief.

4

5    _____        _____

6    DATE                     PATROLMAN DAVID PERROTTI

7

8    At _____in said County of

9    _____, this _____ day of

10   _____, 2003, personally appeared,

11   PATROLMAN DAVID PERROTTI, and he made oath to the

12   truth of the foregoing answers by him subscribed.

13

14

15   Before me, _____, Notary Public.

16   My Commission expires: _____

17

18

19

20

21

22

23

24

25   (CCS, September 17, 2003)


GORDON & ASSOCIATES

Perrotti      72

1              CERTIFICATE OF REPORTER

2        I, Carol C. Schindler, a Notary Public duly

3   commissioned and qualified in and for the State of

4   Connecticut, do hereby certify that pursuant to

5   Notice, there came before me, on the 17th day of

6   September, 2003, the following named person, to wit:

7   PATROLMAN DAVID PERROTTI, who was by me duly sworn to

8   testify to the truth and nothing but the truth; that

9   he was thereupon carefully examined upon his oath and

10  his examination reduced to writing under my

11  supervision; that this deposition is a true record of

12  the testimony given by the witness.

13       I further certify that I am neither attorney nor

14  counsel for, nor related to, nor employed by any of

15  the parties to the action in which this deposition is

16  taken, and further, that I am not a relative or

17  employee of any attorney or counsel employed by the

18  parties hereto, or financially interested in the

19  action.

20       IN WITNESS THEREOF, I have hereunto set my hand

21  and affixed my seal this 29th day of September, 2003.

22

23                    _____
                      Carol C. Schindler, CSR, No. 38
24                    Notary Public

25  My Commission expires:  May 31, 2006

GORDON & ASSOCIATES

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KARL HOGFELDT | : | NO.: 3:01CV1979 (WWE) |
| | : | |
| v. | : | |
| | : | |
| OLD SAYBROOK POLICE DEPARTMENT | : | |
| SERGEANT DONALD HULL; PATROLMAN | : | |
| DAVID PERROTTI; PATROLMAN CHRIS | : | |
| DEMARCO; PATROLMAN JAY RANKIN; | : | |
| EACH INDIVIDUALLY AND AS POLICE | : | |
| OFFICERS AND MEMBERS OF THE OLD | : | |
| SAYBROOK POLICE DEPARTMENT; AND | : | |
| THE TOWN OF OLD SAYBROOK | : | FEBRUARY 17, 2003 |

**A F F I D A V I T**

I, Chief Edmund Mosca, being duly sworn, depose and say:

1.      I am over eighteen years of age;

2.      I understand the obligations of an oath;

3.      I the Police Chief of the Old Saybrook Police Department;

4.      I have personal knowledge of the following;

5.      In the past five years, the Old Saybrook Police Department has not had one claim of excessive force made against it.

Exhibit I

Dated at Old Saybrook, Connecticut, this 18th day of February, 2003.

/s/ Edmund Mosca
Chief Edmund Mosca

STATE OF CONNECTICUT                    )
                                        ) ss:  Old Saybrook
COUNTY OF MIDDLESEX                     )

Subscribed and sworn to before me this 18th day of February, 2003.

/s/ Daniel C. DeMerchant
Commissioner of the Superior Court
~~Notary Public~~
~~My commission expires:~~

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KARL HOGFELDT | : | NO.: 3:01CV1979 (WWE) |
| | : | |
| v. | : | |
| | : | |
| OLD SAYBROOK POLICE DEPARTMENT | : | |
| SERGEANT DONALD HULL; PATROLMAN | : | |
| DAVID PERROTTI; PATROLMAN CHRIS | : | |
| DEMARCO; PATROLMAN JAY RANKIN; | : | |
| EACH INDIVIDUALLY AND AS POLICE | : | |
| OFFICERS AND MEMBERS OF THE OLD | : | |
| SAYBROOK POLICE DEPARTMENT; AND | : | |
| THE TOWN OF OLD SAYBROOK | : | FEBRUARY 17, 2003 |

## A F F I D A V I T

I, Sergeant Timothy McDonald, being duly sworn, depose and say:

1.      I am over eighteen years of age;

2.      I understand the obligations of an oath;

3.      I am a sergeant with the Old Saybrook Police Department;

4.      I am the keeper of records for training, and have personal knowledge of the following taken from records on file at the Old Saybrook Police Department;

5.      The Town of Old Saybrook requires that all officers adhere to the training protocol established by state standards;

Exhibit J

6.      Before the subject incident, Sergeant Hull, Patrolman DeMarco, Patrolman Rankin, and Patrolman Perrotti, completed training at the Connecticut State Police Academy;

7.      While at the Police Academy, the defendant officers received training in, among other topics, human relations and use of force;

8.      Prior to 2000, the defendant officers were required to attend approximately (40) forty hours of training in job related subjects within a three-year period to re-certify;

9.      In July of 2002, this requirement was increased to (60) sixty hours;

10.     Prior to October 21, 1999, the defendant officers attended supplemental training courses as part of their pre-certification requirement dealing with laws of arrest, and use of force;

11.     Sergeant Hull has had no citizen complaints filed against him at any time during his fourteen years of police service for the Old Saybrook Police Department;

12.     Additionally, the Police Department has never initiated an internal affairs investigation against Sergeant Hull for any reason;

13.     At the time of this incident, the Town of Old Saybrook police department had a written police policy concerning, inter alia, use of force, custody of prisoners and detention /holding area operations;

14.     The written policy is set forth within the document titled Rules and Regulations, 36.01, 36.02, 56.06., attached hereto.

Dated at Old Saybrook, Connecticut, this 18th day of February, 2003.


/s/ Sgt. Timothy McDonald
Sergeant Timothy McDonald



STATE OF CONNECTICUT          )
                              ) ss:  Old Saybrook
COUNTY OF MIDDLESEX           )

Subscribed and sworn to before me this 18th day of February, 2003.


/s/ Daniel C. DeMerchant
Commissioner of the Superior Court
~~Notary Public~~
~~My commission expires:~~

# OLD SAYBROOK DEPARTMENT OF POLICE SERVICES

## RULES & REGULATIONS

### INDEX

#### SECTION I

Preface
Introduction
Organizational Chart/Chain Of
Command

#### SECTION II

Command and Supervisory
Responsibility
Formal Organization
Cannons Of Law Enforcement Ethics

#### SECTION III
#### (Job Descriptions)

Chief Of Police
Deputy Chief Of Police
Lieutenant
Patrol Sergeant
Patrol Officer
Detective
Communications Technician

#### SECTION IV
#### (General Regulations)

**30.00   Conduct Regulations**
30.01   Duty to Obey
30.02   Civility
30.03   Questions Of Citizens
30.04   Divulging Information
30.05   Controversial Discussion
30.06   Respect
30.07   Truthfulness
30.08   Criticism and Malicious Gossip
30.09   Political Activity
30.10   Contributions

30.11   Intoxicants, Drugs, Etc.
30.12   Use Of Intoxicants
30.13   Use Of Drugs
30.14   Smoking
30.15   Carrying Packages In Uniform
30.16   Use Of Private Vehicles
30.17   Gambling
30.18   Written Communication
30.19   False Information On Records
30.20   Misappropriation Of Property
30.21   Marking, Altering Notices
30.22   Prohibited Places
30.23   Consorting With Criminals
30.24   Loitering by Uniformed
Employees
30.25   Duty Time Limited To Police
Business
30.26   Recommendation Of
Atty./Bondsman
30.27   Recommending Services
30.28   Interfering With Course Of
Justice
30.29   Recommendation For
Disposition Of Case
30.30   Statements Concerning Liability
30.31   Withholding Evidence
30.32   Testimony In Civil Cases
30.33   Soliciting Petitions For
Promotions/Duty Change
30.34   Distribution Of Cards, Buttons,
Etc.
30.35   Seeking Gifts
30.36   Accepting Gifts
30.37   Rewards
30.38   Testimonial And Presents
30.39   Payment Of Debts
30.40   Ethics
30.41   Knowledge Of Police
Regulations/Policies

Exhibit K

**31.00    Weapons**
31.01    Use Of Weapons
31.02    Carrying Weapons Off Duty
31.03    Annual Firearms Qualifications
31.04    Condition, Loss, Damage To Firearms
31.05    Custody Of Department Weapons Or Ammunition
31.06    Repair Or Alteration Of Firearms
31.07    Target Practice
31.08    Protection Of The Public

**32.00    Mandatory Duty Requirements**
32.01    Effectiveness Of Orders
32.02    Instant Action
32.03    Duty Status
32.04    General Knowledge And Performance
32.05    Attention To Duty
32.06    Rendering Assistance
32.07    Duty To Report Information
32.08    Assisting Members Of The Department
32.09    Reporting For Duty/Inspection
32.10    Physical Fitness And Overweight
32.11    Bearing
32.12    Neatness
32.13    Knowledge Of The Town
32.14    Conflict Of Orders
32.15    Complying With Instructions From E911 Communications
32.16    Unnecessary Radio Transmissions
32.17    Radio Alpha Codes
32.18    Duty To Report
32.19    Unsecured Buildings
32.20    Wearing Of Traffic Vests
32.21    Eating In Assigned Areas
32.22    Patrolling In Assigned Areas
32.23    Duty To Testify

**33.00    Police Vehicles**
33.01    License Requirements
33.02    Authority To Operate
33.03    Police Officers As Riders
33.04    Off Duty Use Of Police Vehicle

33.05    Rider/Observers In Police Vehicle
33.06    Safe Driving Of Department Vehicles
33.07    Accidents Involving Police Vehicles
33.08    Injuries To Persons/Property
33.09    Responsibility For Department Vehicle
33.10    Operation Of Police Vehicle
33.11    Unattended Police Vehicle
33.12    Use Of Cruise Lights

**34.00    Use Of Telephone**
34.01    Telephone Requirement
34.02    Disclosure Of Telephone Numbers
34.03    Use Of Telephone For Long Distance Calls
34.04    Service Calls
34.05    Personal Call
34.06    Responsibility For Telephone Calls

**35.00 Town Property**
35.01    Responsibility For Town Property
35.02    Lost/Damaged Town Property
35.03    Responsibility Of Police Badge/Identification

**36.00 Prisoners**
36.01    Custody Of Prisoners
36.02    Detention/Holding Area Operations

**37.00    Handling Of Evidence/Property**
37.01    Evidence
37.02    Handling Of Money/Property
37.03    Return Of Personal Property
37.04    Handling Of Controlled Substances
37.05    Property Seized During Search Warrant
37.06    Property Seized Without A Search Warrant

**38.00   Trials And Hearings**
38.01   Attendance At Trial/Special Hearings
38.02   Trials/Hearings

**39.00   Miscellaneous Regulation**
39.01   Incurring Department Liability
39.02   Seniority
39.03   Membership In Military Organizations
39.04   Use Of Department Reports, Records, Communications
39.05   Change Of Address/Telephone Number

**51.00   Appointment Of Patrol Officer**
51.01   Authority
51.02   Qualifications
51.03   Oath Of Office

**53.00   Promotions**
53.01   Authority
53.02   Policy
53.03   Eligible List
53.04   General Requirements
53.05   Examinations
53.06   Credit Points

**54.00   Commendation Board**
54.01   Organization
54.02   Authority Of Commendation Board
54.03   Departmental Citation For Meritorious Services
54.04   Honorable Mention

**55.00   Charges And Hearings**
55.01   Authority
55.02   Duty To Obey
55.03   Violation Of Rules And Regulations
55.04   Purpose Of Hearings
55.05   Conduct Of Hearings
55.06   Punishable Offenses
55.07   Charges And Specifications
55.08   Correction And Admonition
55.09   Official Reprimand

55.10   Complaints By Members Of The Department
55.11   Duty Of Commanding Officer Relative To Complaints
55.12   Preparation Of Charges
55.13   Summary Power Of Chief Of Police
55.14   Report To Police Commission
55.15   Complaints Be Chief Of Police
55.16   Complaints By Citizen
55.17   Unreasonable Complaint
55.18   Trial Witnesses And Others Under Oath
55.19   Suspension
55.20   Wearing Of Uniform While Under Suspension
55.21   Intercession Forbidden

**56.00   Arrests**
56.01   Miranda Warnings
56.02   Questioning/Detaining Suspects
56.03   Search Of Detained Persons For Weapons
56.04   Where Arrests May Be Made
56.05   Duty To Inform Person Arrested
56.06   Use Of Force
56.07   Search And Seizure
56.08   Search Of Automobiles
56.09   Search Of Residences
56.10   Use Of Force To Serve Search Warrant
56.11   Authority To Serve Criminal Process
56.12   Guarding Prisoners (See Prisoner Transportation Policy)
56.13   Searching Prisoners
56.14   Searching Female Prisoners
56.15   Military Personnel In Custody

**57.00   Dead Bodies**
57.01   Notification Process
57.02   Information For Medical Examiner
57.03   Removal Of Deceased Bodies
57.04   Personal Effects Of Deceased
57.05   Removal Of Deceased From Public
57.05   Notification Of Next Of Kin

**58.00   Safeguarding The Crime Scene**
58.01   General
58.02   Steps To Be Taken By First
Officer On Scene
58.03   Establishing The Crime Scene
Perimeter
58.04   Searching A Crime Scene


**60.00   Outside Employment**
60.01   Application For Outside
Employment
60.02   Availability
60.03   Outside Police Duty


**61.00   Police Employment**
61.01   Resignation
61.02   Dismissal
61.03   Reinstatement


**62.00   The Police Uniform**
62.01   Wearing Of The Uniform


**63.00   Honors, Courtesies And**
Ceremonies
63.01   Saluting The Colors
63.02   The National Anthem
63.03   Marching
63.04   Funerals
63.05   Funeral Honor Guard


**64.00   Arrest Procedures**
64.01   General
64.02   Arrest Without A Warrant
64.03   Arrest Of A Felon
64.04   Arrest For A Misdemeanor


**72.00   Reporting Of Unauthorized**
Signs And Hazardous Obstructions

## 36.00 PRISONERS

**36.01 CUSTODY OF PRISONERS-** Any member of the department who has the custody of any persons or persons under arrest or detention shall be responsible for the proper safety of such person or persons, including their property, for the period of time they remain in his/her custody.

When a custodial arrest is made, upon arriving at headquarters, the prisoner shall be brought directly to the processing room or placed in the Detention Area. The Interview Rooms should not be utilized to hold prisoners.

All attempts should be made to release the prisoner on a PTA or cash bond.

**36.02 DETENTION/HOLDING AREA OPERATIONS-** The following procedures will be followed by all department personnel in conjunction with the operation of the department Detention/Holding area.

A. The Shift Supervisor shall be responsible for all persons confined to the detention cells. In the absence of a Shift Supervisor the Desk Officer will be responsible for persons confined in the detention area. The Commanding Officer or Shift Supervisor will advise the Desk Officer when a person is confined. The Desk Officer will be responsible for the video monitoring of those persons confined and shall in addition physically check the detention area randomly on half hour intervals. Any discrepancy shall be recorded and reported to the Shift Supervisor immediately.

B. Prior to a prisoner being placed into the detention area, the Shift Commander will be notified and be present upon initial entry into the Detention Area. When a Shift Supervisor is placing an arrestee into the Detention Area, he/she shall have another officer present.

C. Prior to being placed in the Detention Area, the Shift Supervisor shall insure that the prisoner is searched thoroughly and any article capable of injury to the prisoner or others is removed along with any belts, straps, shoe laces or straps, chains and other loose clothing. All items removed from the prisoner shall be inventoried, placed in an envelope and marked with a receipt.

The Shift Supervisor shall also determine if there are any medical needs that the prisoner may require and so note on the proper log.

D. When a prisoner is placed in the Detention Area the proper information shall be recorded on the shift log by the Desk Officer. This information shall contain the time that the prisoner was confined, cell number, and the Shift Supervisor and officers name who placed the prisoner in the Detention Area. When the prisoner is released from the Detention Area, the time and date of release, officers name who completed the release and reason for release will be recorded on the shift log by the Desk Officer.

E. Prisoners confined in the Detention Area are to be made as comfortable as practical. They shall be given sufficient food or drink at reasonable intervals which shall be purchased by the Town. There will be no smoking allowed at any times by prisoners.

F. No persons except department personnel will be allowed to enter the Detention Area. Prisoners will not be allowed to have visitors while in the Detention Area. If a prisoner requests an attorney to speak with, the prisoner will be brought to either the Processing Room or Interview Room where they may speak with an attorney. The prisoner shall be properly guarded from escape, and to prevent transfer of any illegal item, the prisoner shall be searched prior to be returned to the Detention Area.

G. Any prisoner who becomes ill or injured while confined in the Detention Area will be given immediate medical aid. If necessary, EMS or a physician shall be requested. If it is determined that a prisoner must be transported to a medical facility, the Shift Supervisor shall assign an officer to that transport for security of the prisoner.

H. At no time will a person be confined to the Detention Area without being properly arrested, and, no prisoner shall be released by an officer of this department unless under proper legal means.

I. In the event a prisoner should die or commit suicide while in the Detention Area, the Chief Of Police will be notified immediately, and shall initiate an investigation to determine the causes and responsibilities and other facts concerning the incident.

J. At no time will juvenile prisoners, male or female, under the age of 16, be placed in the Detention Area. If detention of a juvenile is necessary, he/she shall be brought to a Juvenile Detention Center as soon as practicable.

K. Violations of any of the foregoing sections shall be cause for disciplinary action and could result in dismissal from the department.

department effects an arrest, with or without a warrant, the officer is required to inform the person arrested of the reason for his/her arrest.

**56.06 USE OF FORCE** - Members of this department shall not use any more force than is necessary in making an arrest, and shall not subject a person arrested to more restraint than is reasonable for the arrest and detention, and for the safety and protection of the prisoner, arresting officer(s) and the public. (See Use Of Force Policy)

**56.07 SEARCH AND SEIZURE** - When an officer(s) of this department executes a Search and Seizure warrant, an appropriate amount of force can be used to overcome any resistance while he is executing the warrant. A forceful entry can be used to gain entry to the place to be searched as identified on the warrant. Officers may only search those areas identified on the warrant and seize only those items listed. The officer(s) conducting the search may seize other contraband if in plain view in the area of the search conducted.

When effecting an arrest, a police officer may search a person(s) incident to arrest for any contraband or weapons, and may search that area within reach or control of the person arrested.

**56.08 SEARCH OF AUTOMOBILES** - An automobile may be searched by a police officer whenever it is incident to arrest or when the owner or person in possession of the automobile gives consent to a search. It is incumbent upon the police officer to first make an arrest or receive proper permission or consent to search. If a consent to search is given, the proper department

Consent To Search form will be initiated by the police officer.

When an automobile has been impounded or taken into custody, a full examination must be made of its contents and the contents of any container therein. All contents shall be listed on the departments Inventory Invoice form.

**56.09 SEARCH OF RESIDENCES** - A search of a residence without a warrant can be made only incident to an arrest. The area of the search must be confined to that area in the immediate control or reach of the person arrested. A consent to search, or a search warrant may be obtained by the officer before any other area can be searched.

**56.10 USE OF FORCE TO SERVE A SEARCH WARRANT** - A police officer in possession of a valid search warrant has the authority and power to use whatever force is necessary to open doors or windows, and, to overcome resistance to gain entry to a residence to effect the search warrant.

**56.11 AUTHORITY TO SERVE CRIMINAL PROCESS** - A police officer has the authority within the limits of the Town Of Old Saybrook to serve any criminal process lawfully issued by any court or division of the Criminal Justice System.

**56.12 GUARDING PRISONERS** - (See Prisoner Transportation Policy)

**56.13 SEARCHING PRISONERS** - When making an arrest, the officer shall search the prisoner carefully and shall immediately take possession of all weapons, evidence and contraband. If for any reason a prisoner is being turned over to another officer prior to