1

```
 1                UNITED STATES DISTRICT COURT
 2                  DISTRICT OF CONNECTICUT
 3
 4  KARL HOGFELDT                    :  NO.:  3:01CV1979 (WWE)
 5  V.                               :
 6  OLD SAYBROOK POLICE DEPARTMENT   :
    SERGEANT DONALD HULL;
 7  PATROLMAN DAVID PERROTTI;        :
    PATROLMAN CHRIS DEMARCO;
 8  PATROLMAN JAY RANKIN; EACH       :
    INDIVIDUALLY AND AS POLICE OFFICERS
 9  AND MEMBERS OF THE OLD SAYBROOK  :
    POLICE DEPARTMENT; AND THE TOWN
10  OF OLD SAYBROOK                  :  JANUARY 17, 2005
11  DEPOSITION OF:  IRA KANFER, M.D.
12  APPEARANCES:
13  SPINELLA & ASSOCIATES
            Attorneys for the Plaintiff
14          One Lewis Street
            Hartford, CT  06103
15          (860)
    BY:  A. PAUL SPINELLA, ESQ.
16
17  HOWD & LUDORF
            Attorneys for the Defendant
18          65 Wethersfield Avenue
            Hartford, CT  06105
19          (860) 249-1361
    BY:  JOHN J. RADSHAW, III, ESQ.
20
21
22
23
24            Hilary O. Winslow
       Licensed Court Reporter, #00361
25
```

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, CT  06108
(860) 291-9191

27

1    Q.   All right. Could you show me what you had in
2  your file at the time you wrote your report dated
3  February 9th, 2004?
4    A.   Yes. I had the deposition of Donald Hull. I had
5  the medical records from the hospital, and I had answers to
6  plaintiff's interrogatories.
7    Q.   So at the time you generated the report dated
8  February 9th, 2004, the only documents you had were the
9  deposition of Sergeant Hull, the plaintiff's medical records
10 from his hospital admission, the day following the incident
11 that forms the subject matter of the plaintiff's complaint,
12 and the plaintiff's answers to the defendant's
13 interrogatories; is that correct?
14   A.   Yes.
15   Q.   Did you, prior to formulating your opinion in
16 your report, did you consult any books or treatises?
17   A.   No.
18   Q.   Did you conduct any tests?
19   A.   No.
20   Q.   Build any models?
21   A.   No.
22   Q.   Physically examine the plaintiff at any time?
23   A.   No.
24        MR. RADSHAW: Mark that as 3, please.
25

28

```
 1              (Defendant's Exhibit No. 3, Plaintiff's
 2     Disclosure of Expert Witness; No. 4, Plaintiff's
 3     Supplemental Expert Witness Disclosure, marked for
 4     identification.)
 5
 6         Q.   (By Mr. Radshaw) I know I asked you about books
 7     and treatises.  Did you consult any articles or perform a
 8     literature search in connection with formulating your
 9     opinions?
10         A.   No.
11         Q.   Okay.  One thing I didn't ask you about is your
12     educational background.  Can you briefly summarize for me
13     your educational background from undergraduate degree coming
14     forward in time?
15         A.   Yeah.  I went to college at Purdue.  I went and
16     got a master's at University of Wisconsin.  I went to
17     medical school in Illinois.  I did a residency in pathology
18     in Houston, Texas, for a year.  I worked as a medical
19     examiner, was a fellow at Miami Dade Medical Examiner, and
20     for the last 19 years have been working at the medical
21     examiner's office in Farmington.
22         Q.   And your undergraduate and master's degrees were
23     in psychology; is that right?
24         A.   Yes.
25         Q.   Okay.  Then you took the standard medical
```

```
 1  curriculum for medical school at Southern Illinois
 2  University; is that right?
 3       A.   Yes.
 4       Q.   Other than those educational experiences, do you
 5  have any special training of a law enforcement nature?
 6       A.   No.
 7       Q.   Do you hold any other licenses other than your
 8  Florida and Connecticut medical licenses?
 9       A.   No.
10       Q.   Do you hold any special certifications of any
11  nature?
12       A.   Yes.
13       Q.   Could you please describe for me your
14  certifications?
15       A.   Board certified in anatomic pathology, clinical
16  pathology, and forensic pathology.
17            MR. RADSHAW:  Could you read those three back to
18  me.
19            (Answer was read back.)
20       Q.   (By Mr. Radshaw) Other than the three board
21  certifications, are you board certified in any other thing?
22       A.   No.
23       Q.   Could you briefly describe for me what it means
24  to be board certified in anatomic pathology?
25       A.   Anatomic pathology is a subspecialty of
```

1  for, say, the activities of police officers?
2      A.  No.
3      Q.  So you have no expertise in local or national
4  police standards of any kind?
5      A.  That's correct.
6      Q.  And as you described for me, your expertise is in
7  how disease and trauma effect the physical body; is that
8  right?
9      A.  Yes.
10     Q.  The document that's been marked as Defendant's
11 Exhibit 3 is Plaintiff's Rule 26 Disclosure of Expert
12 Witness dated November 12th, 2003.  Have you ever seen
13 this document before, Dr. Kanfer?
14     A.  Yes, I have.
15     Q.  Do you remember when you first saw it?
16     A.  I would say sometime in the last couple of weeks.
17     Q.  Okay.  Did you see it on or about
18 November 12th, 2003?
19     A.  No.
20     Q.  Okay.  So it was sometime after that date; is
21 that correct?
22     A.  Yes.
23     Q.  So it would be fair to say that you didn't review
24 this before it was filed, did you?
25     A.  No.

1    A.    Could you repeat that question?

2         MR. RADSHAW:  Would you read it back.

3         (Question was read back.)

4         THE WITNESS:  Based on a reasonable degree of
5    medical probability, the constellation of injuries that
6    Mr. Hogfeldt sustained is consistent with a fall against the
7    wall and subsequent falling to the ground.  The injuries,
8    including multirib fractures, are consistent with an
9    assault.

10   Q.   (By Mr. Radshaw) Okay.  Do you have an opinion as
11   to when Mr. Hogfeldt was injured?

12   A.   Yes.

13   Q.   Could you tell me when that was?

14   A.   At the police station.

15   Q.   And what -- on what do you base that opinion that
16   Mr. Hogfeldt was injured at the police station?

17   A.   Well, one, based on Mr. Hogfeldt's statement
18   which is completely consistent with the injuries he
19   sustained; two, the statement of Officer Hull as to what
20   transpired at the police station, which is inconsistent with
21   the injuries Mr. Hogfeldt sustained.  And that's the basis
22   of the opinion.

23   Q.   Okay.  Now, is that opinion to a reasonable
24   degree of medical probability?

25   A.   Yes, it is.

```
 1        Q.   Okay.  So is it possible that Mr. Hogfeldt was
 2   injured sometime prior to his arrival at the police station?
 3        MR. SPINELLA:  Objection to the form.  You can
 4   answer.
 5        THE WITNESS:  Unlikely.
 6        Q.   (By Mr. Radshaw) Is it possible that Mr. Hogfeldt
 7   was injured sometime after he departed the police station on
 8   the night in question?
 9        MR. SPINELLA:  Objection.
10        THE WITNESS:  Unlikely.
11        Q.   (By Mr. Radshaw) But you weren't there at the
12   police station, so you have no firsthand knowledge of the
13   incident; is that correct?
14        A.   That's correct.
15        Q.   So you're relying entirely upon Mr. Hogfeldt's
16   statement and your interpretation of the facts from Officer
17   Hull's deposition; is that correct?
18        A.   As well as the physical evidence.
19        Q.   Okay.  And what physical evidence are you relying
20   on that supports your opinion to a reasonable degree of
21   medical probability that Mr. Hogfeldt's injuries occurred at
22   the police station?
23        A.   Well, one, he comes into the police station with
24   no obvious injuries.  He leaves the police station with
25   obvious injuries, which are subsequently, I believe, the
```

40

1  next day or less than a day evaluated at the hospital. But
2  clearly when he left the police station, he had a swollen
3  nose; he had an ecchymotic eye and a swollen forehead. The
4  other injuries were elucidated at the hospital by x-ray. So
5  you put it all together -- I mean, you have what Officer
6  Hull says happened at the police station; you have what
7  Mr. Hogfeldt says happened at the police station; you have
8  the physical evidence, which is documented in the medical
9  record. And in reasonable medical probability,
10 Mr. Hogfeldt's rendition of the events makes much more sense
11 than Officer Hull's.
12     Q.  Do you know how much time elapsed between
13 Mr. Hogfeldt's discharge from the police station and his
14 presentment for medical treatment?
15     A.  I would say greater than 26 hours.
16     Q.  Okay. And that's not a significant factor?
17     A.  Based on other information, no.
18     Q.  What other information qualifies that passage of
19 time?
20     A.  Well, when he left the police station, you know,
21 the obvious black eye, broken nose, blood coming from the
22 nose. Plus, after he left the police station, he was
23 observed by other people and seen not to have injured
24 himself in any way.
25     Q.  Do you know what other people observed him?

44

1    A.    Well, other than the possibility of having a
2  frozen elbow and basically loss of use of an arm, no.
3    Q.    But that sounds like -- withdraw that.  Is that
4  also a problem that occurs in the short term, that is, after
5  it occurs?
6    A.    It could occur in the short term; it could occur
7  in the long term.  And this is what the medical people have
8  to be concerned about, that the person does not get a frozen
9  elbow.
10    Q.    Okay.  Is it your opinion to a reasonable degree
11  of medical probability that Sergeant Hull is the individual
12  who assaulted Mr. Hogfeldt?
13    A.    It would seem so.
14    Q.    So it's correct that it's your opinion to a
15  reasonable degree of medical probability that Sergeant Hull
16  assaulted Mr. Hogfeldt; is that correct?
17    A.    Right.
18    Q.    Okay.  Is it correct to say that Mr. Hogfeldt's
19  injuries are injuries that are caused by blunt force trauma?
20    A.    Yes.
21    Q.    Okay.  And what can cause blunt force trauma?
22    A.    Anything.
23    Q.    Okay.  So it could be anything from a person's
24  fist, to a chair, to a wall; is that correct?
25    A.    That's correct.

45

1  Q. Okay. Did you determine what sort of blunt force
2  trauma caused Mr. Hogfeldt's injuries that form the subject
3  matter of this complaint?
4  A. Well, I determined what didn't cause some of the
5  injuries.
6  Q. Okay. Please tell me what you determined did not
7  cause the injuries suffered by Mr. Hogfeldt.
8  A. The two broken ribs were not caused in the
9  fashion that Officer Hull described -- being placed against
10 a wall and then subsequently sliding down the wall, grabbing
11 a chair, falling to his knees and falling to the floor. You
12 just don't get broken ribs that way. As far as the other
13 injuries, it's completely consistent -- of the face -- it's
14 completely consistent with Mr. Hogfeldt's rendition of
15 events that he was smashed against the wall by Attorney --
16 by Officer Hull. Freudian slip there.
17    MR. RADSHAW: Freudian slip.
18    THE WITNESS: So that's completely consistent,
19 although, clearly, he could have been punched or kicked or
20 something like that.
21 Q. (By Mr. Radshaw) So the injuries to the face
22 which would be the nose, the maxilla, and the hematoma on
23 the forehead?
24 A. Right.
25 Q. It's your testimony to a reasonable degree of

1  medical probability those are all consistent with being
2  slammed against the wall; is that right?
3      A.   It's consistent with being slammed against the
4  wall.
5      Q.   All right.  Is it also consistent with someone
6  who's intoxicated running into the wall?
7      A.   It could be, but based on the circumstances, it's
8  unlikely, since the way Officer Hull describes the scene at
9  the wall, Mr. Hogfeldt is no longer cuffed.  So if he was
10 to -- assuming he was intoxicated and assuming he did
11 stumble into the wall, the natural response is -- and
12 assuming he's standing, obviously, because he's not that
13 drunk that he's completely passed out.  So we're assuming
14 that he's standing.  The natural response, of course, is to
15 put one's hands in front of the wall, which is a reflexive
16 action.  So these injuries of the broken nose, the fracture
17 of the maxilla, and the black eye, the placing of the hands
18 against a wall would mitigate against that act.
19     Q.   Have you done any tests or reviewed any
20 literature or conducted any studies to determine -- withdraw
21 that.  Would Mr. Hogfeldt's intoxication, assuming that he
22 was, affect his ability to reflexively put his hands up to
23 prevent him from hitting a wall?
24     A.   It could depending on, one, how intoxicated he
25 was.

 1   Q.  Now, have you done any studies, consulted any
 2  literature, or other activities to compare the type of
 3  injuries that occur when someone walks into a wall and maybe
 4  catches themselves with their hands in a reflexive action
 5  versus somebody who is slammed into the wall with the force
 6  and weight of another person behind them?
 7   A.  Yeah.  I mean, if you walk into a wall and you
 8  put up your hands, you're not going to get the type of
 9  injuries that Mr. Hogfeldt sustained.
10   Q.  So you've done a study about this?
11   A.  Well, it's 20 years of experience with trauma.
12   Q.  So your opinion that -- withdraw that.  So
13  it's -- your opinion is based solely on your experiences of
14  viewing trauma over 20 plus years as a medical doctor; is
15  that right?
16   A.  Right.
17   Q.  So you haven't conducted any studies or performed
18  any tests that would measure at what point or how fast
19  someone would have to proverbially hit the wall?
20   A.  No, I have not thrown somebody at different
21  speeds into the wall and see what type of injuries they
22  sustain, that's correct.
23   Q.  Or let them walk in at their own speed?
24   A.  Or let them walk into the wall at their own
25  speed.

*NIZIANKIEWICZ & MILLER REPORTING SERVICES*
*972 Tolland Street*
*East Hartford, CT  06108*
*(860) 291-9191*

1  this case that you have an opinion about is Officer Hull; is
2  that right?
3     A.  I mean, I really don't have an opinion about
4  Officer Hull.  All I'm saying is that based on the two
5  scenarios given to me, one by Mr. Hogfeldt and one by
6  Officer Hull, Mr. Hogfeldt's rendition -- Mr. Hogfeldt's
7  story comports with the facts where Officer Hull's does not.
8  Now, if there were other people in the room or involved or
9  not, I don't know.
10    Q.  So you don't have an opinion as to those people?
11    A.  No.
12    Q.  Okay.  Now, essentially though, your opinion
13 requires you to believe Mr. Hogfeldt's version of events
14 doesn't it?
15    A.  No, it doesn't require me to believe it.  The
16 one thing I assume to be true is the report from the
17 hospital documenting his injuries.  I have to assume that's
18 fact.  Then I get two stories -- and which story fits best
19 with his injuries?  That's all I'm saying.
20    Q.  I just want to make sure that I understand your
21 opinion.  As the only opinion you have to a reasonable
22 degree -- withdraw that.  Is it correct that the only
23 opinion you have to a reasonable degree of medical
24 probability is the last paragraph of your letter to your
25 report?