1

1     UNITED STATES DISTRICT COURT

2        DISTRICT OF CONNECTICUT

3   KARL HOGFELDT           NO.: 3:01CV1979(WWE)

4   VS

5   OLD SAYBROOK POLICE

6   DEPARTMENT, ET AL           February 23, 2005

7

8        DEPOSITION OF LOU REITER

9

10  APPEARANCES:

11          SPINELLA & ASSOCIATES
                Attorneys for the Plaintiff
12              One Lewis Street
                Hartford, Connecticut 06103
13          BY:  A. PAUL SPINELLA, ESQ.

14          HOWD & LUDORF
                Attorneys for the Defendants
15              65 Wethersfield Avenue
                Hartford, Connecticut 06114
16          BY:  JOHN J. RADSHAW, III, ESQ.

17

18

19

20

21

22              DONALD E. HUBBARD, LSR #00007
                REGISTERED PROFESSIONAL REPORTER
23

24

25

29

1   what the officers -- well, some of what the officers

2   said, the response to an intoxicated person in the way

3   of handling him would have been contrary to generally

4   accepted police practices when you're dealing with an

5   intoxicated person, but then the force used as described

6   by Mr. Hogfeldt and seemingly supported by the extent of

7   his injuries would have indicated that the force used by

8   Sergeant Hull was objectively unreasonable and contrary

9   to generally accepted police practices.  There are some

10  other issues, and the issues that I've addressed is the

11  response on the part of the police department and

12  Sergeant Hull and the other officers was not consistent

13  with generally accepted police practices as well when

14  you're dealing with someone who is injured while in the

15  custody and care of police officers.

16       Q    So, it would be fair to say that your opinion

17  covers two issues, the use of force on Mr. Hogfeldt

18  while at the police station and then the response of the

19  officers after Mr. Hogfeldt was allegedly injured; is

20  that right?

21       A    Yes.

22       Q    Other than those two areas, do you have any

23  other opinions on any other areas of the conduct of the

24  defendants in this case?

25       A    Other than to my knowledge there was never an

33

1  of those injuries.   There was no photographic evidence

2  that would have been done in a reasonable manner to

3  identify even if he had only had a bloody nose as

4  Sergeant Hull testified.   There was no documentation to

5  support that the videotape of that area was in fact not

6  working that day.   There is failure on the part of all

7  three officers who became aware of injuries to Mr.

8  Hogfeldt while he was in the custody of the police

9  officers that there was no medical attention provided to

10  him.

11          The officers indicate that they said -- they

12  offered to get him an ice pack and they offered to call

13  for medical treatment.   Those are nice, but when you've

14  got someone in custody, that person is under your care

15  and control, particularly if you know the person is

16  intoxicated, those kinds of persons can't always make

17  reasonable, rational decisions, and a generally accepted

18  practice is to provide that medical treatment as long as

19  they are in your care.

20          Now, once the medical persons, whether it's

21  an EMT or paramedic, a fire department, whoever they use

22  arrive on the scene, Mr. Hogfeldt then could refuse

23  medical treatment, but the advantage and why it's

24  recommended to do that is now you have disinterested

25  witnesses who could corroborate what your observations

34

1  of injuries were, and more importantly you're going to

2  have documentation from the trip slip that they would

3  normally do.

4       Q    Is there anything else in the post force care

5  that you find deficient?

6       A    I didn't see that either of the other

7  officers had ever written a report about what occurred

8  or what they observed and, like I said, to my knowledge

9  there was never an administrative investigation done.

10      Q    Now, you said that there was no photographic

11 evidence of Hogfeldt's injuries; is that correct?

12      A    Yes.  There's one Polaroid and it appears to

13 be a typical booking photograph.  I don't know if that

14 was before or after.  I think -- I don't know if I saw

15 documentation one way or another.  I know Mr. Hogfeldt

16 was surprised that it didn't show the injury to his eye.

17      Q    So, your opinion is that -- your opinion

18 really is that the officers needed to have a better

19 camera and to take more pictures in this case.  Is that

20 fair to say?

21      A    I don't know that they needed a better

22 camera.  What they took, the photograph I have is a

23 booking photograph.  That's the typical kind of booking

24 photograph you have.  That's not a photograph, doesn't

25 appear to be the kind of photograph or photographs that

35

1  you would use to try to document and identify the extent

2  of injuries someone might have had.

3      Q   So, it would be, in your opinion that they

4  might have needed to take closeups or individual

5  pictures of individual areas; is that your opinion?

6      A   That as well as the location if there were

7  blood on the floor, if there were any markings on the

8  wall.  I mean, what you essentially got is you've got,

9  from the police perspective, what you've got is a risk

10 management issue that you want to document.

11     Q   So, if the police officers' version is

12 believed that he merely got a bloody nose by striking

13 the wall, even something as potentially innocuous as

14 that, required, in your opinion, photographs of the

15 scene of the injuries and this kind of photographic

16 documentation; is that right?

17     A   Yes.

18     Q   Okay.  Then you said that there was no

19 documentation that the video was not operating

20 correctly; is that correct?

21     A   Yes.

22     Q   Did you view a video in this case?

23     A   No.

24     Q   Okay.  So, you don't know one way or another

25 what that video shows; is that right?

37

1    focus on Perrotti and DeMarco.  Now, are you aware that

2    the plaintiff is claiming that DeMarco and Perrotti

3    failed to prevent the use of force against him by

4    Sergeant Hull?

5         A    Yes.

6         Q    Okay.  Do you have any opinion on whether or

7    not Officer DeMarco and/or Perrotti were in a position

8    to prevent the use of force?

9         A    I guess two areas.  Mr. Hogfeldt said there

10   was another officer present.  He said a whited-shirted

11   person, who I have assumed was Sergeant Hull, and there

12   was another gray-shirted person who he believed was

13   DeMarco, were in the room when this occurred, when the

14   initial altercation when his head was smashed into the

15   wall, so in that case, yes, DeMarco would have been in a

16   direct position, but more importantly looking at the

17   layout of that location and where Officer Perrotti would

18   have been and having an intoxicated person brought in

19   who was not cooperating, it's unrealistic for an officer

20   not to be conscious of what's occurring and not to watch

21   over the safety and security of fellow officers during

22   that period of time.

23         So, I believe if the extent of the injury

24   comports with what Mr. Hogfeldt said, that not only was

25   he slammed into the wall, but then he was kicked while

38

1   he was on the ground, both of those other officers, in

2   my opinion, would have been in a reasonable location to

3   have either verbally or physically interjected

4   themselves to stop that.

5          Q    And that goes to both Officer DeMarco and

6   Officer Perrotti?

7          A    Yes.

8          Q    And that opinion holds notwithstanding the

9   fact that Perrotti is the dispatcher and 9-1-1 public

10  safety access point in the Town of Old Saybrook?

11         A    Yes.

12         Q    So he should have left his desk to

13  investigate; is that right?

14         A    You know if your pants are down around your

15  ankle you're going to jump in and help a partner if he

16  is involved in an altercation or involved in a tussle

17  with an intoxicated person, yes.

18         Q    But you haven't visited the Town of Old

19  Saybrook Police Department, have you?

20         A    I've only used the photographs that were

21  provided.

22         Q    And you haven't done any tests to determine

23  how far sound might carry in that location under the

24  circumstances as they existed when the incident

25  allegedly occurred?

42

1   right?

2          A    That he was injured, yes.

3          Q    Okay.  What injuries do you believe these

4   officers were aware of at the time he was in the custody

5   of the Old Saybrook PD?

6          A    What they testified to or what their -- what

7   I understand is that he had a bloody nose.

8          Q    And that's what they testified to; isn't that

9   right?

10          A    That's my understanding, yes.

11          Q    Do you believe that there was evidence that

12   the officers overlooked that demonstrated that Hogfeldt

13   had other injuries?

14          A    There could have been.  I don't have an

15   opinion one way or another because I wasn't there and

16   there's no documentation other than he ended up with

17   significant injuries other than simply a bloody nose.

18          Q    Based on your review of the record, is there

19   any objective evidence that he had these other injuries

20   and that they would have been observed at any time prior

21   to his discharge from the police department?

22          A    If these injuries occurred in the police

23   department, any, any reasonable officer would have known

24   that this was other than simply a bloody nose.

25          Q    But it's not your opinion that the officers

47

1       A    Yes.

2       Q    And assuming that Mr. Hogfeldt is believed,

3   there may be at least one other officer who was involved

4   in the use of force; is that right?

5       A    Yes.

6       Q    And the sole evidence that you used to put

7   another officer in that room is based on Mr. Hogfeldt's

8   testimony and his testimony alone; is that right?

9       A    Yes.

10      Q    So, that officer, whether it's DeMarco or

11  Perrotti or an unnamed officer, who is not a defendant

12  in this case, his conduct would be governed by the

13  Fourth Amendment; is that right?

14      A    Yes.

15      Q    And it's your opinion that the officers

16  failed to -- excuse me, that Officer DeMarco and

17  Perrotti failed to intervene; is that right?

18      A    Yes.

19      Q    And that because of their proximity they had

20  a reasonable opportunity to perceive what went on and to

21  get involved; is that right?

22      A    Yes.

23      Q    Okay.  Do you know how big the interview room

24  is?

25      A    I can just estimate from the photograph.

48

1      Q   Sitting here today, I mean, what's your

2  estimation of the size of that interview room?

3      A   It's probably six-by-six.

4      Q   Do you know what was in the interview room at

5  the time Hogfeldt and Sergeant Hull were in it?

6      A   No, because to my knowledge there's no

7  photographs taken immediately after the incident.  I've

8  seen the photographs taken after this occurred and it

9  looks like there was a table and at least one chair.

10      Q   Okay.  And the claim against the two officers

11  who were present and the police department and that they

12  failed to intervene, that will be governed by the Fourth

13  Amendment; is that correct?

14      A   Yes.

15      Q   Now, the --

16      A   At least from a federal level, yes.

17      Q   The six other deficiencies you noted, the

18  lack of appropriate photographic evidence, the lack of

19  appropriate documentation of the inoperability or

20  difficulty with the video system -- excuse me, five

21  things, then the issue with the provision of medical

22  services, the lack of independent reports and lack of

23  administrative investigation, do any of those items

24  enter into the evaluation of Sergeant Hull's use --

25  alleged use of force against Mr. Hogfeldt?

49

1          A    I think that's the totality of it, and the

2   failure to do those things that were reasonable to

3   protect the officers and the city could be also

4   interpreted as a form of a coverup not to create

5   documentation that would support whether Sergeant Hull

6   used unreasonable force.

7          Q    But the ultimate question is whether or not

8   the force was reasonable; is that right?

9          A    Sure.  I think that's the basic threshold.

10         Q    And while these items may be probative of

11  what went on -- withdraw that.  Do you believe that the

12  plaintiff has alleged a Complaint, or excuse me, alleged

13  a claim based on Monell versus Department of Social

14  Services in his Complaint?

15         A    I think the original Complaint laid out those

16  issues.  I really didn't form any opinion on those

17  issues and I think they were training, supervision,

18  hiring and selection and custom and practice.

19              MR. RADSHAW:  Would you mark this as

20  the next exhibit.

21              (A recess was taken from 2:48 to 2:58

22  p.m.)

23              (Defendants' Exhibit 8 marked for

24  identification and described in the index.)

25  BY MR. RADSHAW:

50

1        Q    Mr. Reiter, I showed you a document marked as

2   Defendants' Exhibit 8.  Have you seen that document

3   before?

4        A    Yes.

5        Q    And you reviewed that document in the context

6   of forming your opinions in this case; is that right?

7        A    I did.

8        Q    Okay.  And can you show me in that Complaint

9   where it alleges that the Town of Old Saybrook failed to

10  train or supervise the defendant officers?

11       A    In the Complaint where it says that?

12       Q    Right.

13       A    This is -- okay.  I have to look back.  I

14  don't think this is the Complaint I have (indicating).

15       Q    Okay.

16       A    But this one, the only area you would look

17  toward is Count 1, paragraph 10, which talks about a

18  violation of civil rights which were caused by the

19  implementation of a custom and policy or act of the Town

20  of Old Saybrook by:  A, screening, training,

21  supervision, discipline; and, B, failure to prevent

22  assault and batteries.

23       Q    But you can't point to a specific policy

24  because you haven't formed any opinions on that?

25       A    Correct.  And I haven't seen their policies.

51

1  I have no opinions.

2      Q    And you can't point to any custom that has

3  risen to the force of a policy, can you?

4      A    I have no opinions on that.

5      Q    Okay.  And you have no opinions on the

6  training of Officers DeMarco, Rankin and Perrotti and

7  Sergeant Hull, do you?

8      A    That's correct, I don't.

9      Q    And you have no opinion as to the propriety

10 of their supervision, do you?

11     A    Other than what we've talked about, no.

12     Q    Okay.  Now, do you have any opinions as to

13 whether any other constitutional right of Mr. Hogfeldt's

14 was violated by any of the individual defendants, other

15 than the Fourth Amendment in the context of the alleged

16 use of unreasonable force?

17           MR. SPINELLA:  I have an objection to

18 that, but you can answer.  It is really calling for

19 speculation.  He's not a lawyer here.

20     A    Not as I sit here today.  I mean, some,

21 possibly in the 14th Amendment equal protection and due

22 process, but I don't have any opinions on that.

23 BY MR. RADSHAW:

24     Q    But you're not claiming that the officers

25 denied Hogfeldt his -- denied Hogfeldt medical care

52

1   violative of his 14th Amendment rights, do you?

2        A    I think I am.  I think that's what I

3   testified to.

4        Q    Okay.  And what's the standard to evaluate

5   whether the officers have denied somebody medical care?

6        A    You mean the burden of proof?

7        Q    Start with the measurement, the way that

8   excessive force, the question is whether the use of

9   force was objectively reasonable; is that right?

10       A    Yes.

11       Q    But in terms of denial of medical care, is

12  that the same standard?

13       A    No, it's a deliberate indifference.  At least

14  my understanding, not being a lawyer.

15       Q    And is it your understanding that these

16  officers were deliberately indifferent to Hogfeldt's

17  medical needs?

18       A    In my opinion, they were.

19       Q    Okay.  And that's all the officers but

20  Officer Rankin; is that right?

21       A    Yes.

22       Q    You routinely interact with other experts in

23  your field; is that right?

24       A    Yes.

25       Q    Okay.  What experts, in your experience, that

55

1  that.

2

3                    MR. RADSHAW:  I have no further

4  questions.

5

6                    CROSS EXAMINATION

7  BY MR. SPINELLA:

8        Q    Just a few questions.  Does the phrase "code

9  of silence" mean anything to you?

10       A    Yes.

11       Q    And what does that mean?

12       A    That's simply a reluctance of police officers

13  to come forth with adverse testimony against fellow

14  officers.

15       Q    And is that something that has been the

16  subject of professional study and commentary?

17       A    There's a lot of documentation.  That's what

18  makes it difficult in law enforcement.  It's been

19  institutionalized so long.  You can go back to the 19 --

20  excuse me, the 18 -- trying to remember if -- I think

21  it's '67, 1867 the Voter Rights Act, and then the 1873,

22  Ku Klux Klan Act, that was one of the basic elements.

23             You had all the writings of Niderhoffer,

24  N-i-d-e-r-h-o-f-f-e-r in the '60s and John Q. Wilson and

25  James Reiss, R-e-i-s-s.  They all talk about the code of

57

1   it's absolutely contrary to all the underlying values of

2   law enforcement.

3        Q    Now, are there certain indicia of the code of

4   silence, that is to say are there certain actions that

5   you might observe in a case that might suggest or

6   indicate that the code of silence is in operation in a

7   particular instance?

8        A    There are.  In fact, I've been put under voir

9   dire by a federal judge in Boston on that subject, on

10  some methodology or some points you would use and, yes,

11  there are.

12       Q    Now, in this particular case, did you see any

13  of the -- of that indicia, let's say, that code of

14  silence might have been or was probably, let us say, in

15  effect?

16       A    Yes.

17       Q    And what were they?

18       A    The fact that both DeMarco and Perrotti

19  indicated they heard or saw nothing.  They were in a

20  position not only to have done that, but more

21  importantly, it was an incident which reasonable

22  officers should have focused his or her attention on, if

23  for no other reason than to protect the back of Sergeant

24  Hull who was dealing with someone who everybody

25  acknowledges was belligerent and not cooperating.

61

```
 1                    CERTIFICATE OF DEPONENT
 2          I, LOU REITER, have read the foregoing
 3   transcript of the testimony given at the deposition on
 4   February 23, 2005, and it is true and accurate to the best
 5   of my knowledge as originally transcribed and/or with the
 6   changes as noted on the attached Errata Sheet.
 7
 8
 9
10
11                    _____
                              Signature of Deponent
12
13
14          Subscribed and sworn to before me this _____day
15   of _____, 2005.
16
17
18
19                    _____
                              Notary Public
20
21   My commission expires:
22   3:01CV1979(WWE)
     Karl Hogfeldt vs. Old Saybrook Police Department
23   LOU REITER - February 23, 2005
     (deh)
24
25
```

NIZIANKIEWICZ & MILLER REPORTING SERVICES (860)291-9191