UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**KARL HOGFELDT,**

    **Plaintiff,**

v.                                      3:01CV1979(WWE)

**OLD SAYBROOK, et al.,**

    **Defendants.**
_____/
STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

### PRELIMINARY EXPERT REPORT OF LOU REITER

1.  My name is Lou Reiter. I have been actively involved in police practices and law enforcement since 1961. I was an active police officer for 20 years. Since my retirement in 1981 as an active police officer, I have been involved in police and law enforcement practices as a private police consultant.

2.  Since 1983 I have been providing law enforcement consultation in police training and management. I provide law enforcement training in the following areas:

    - Investigation of critical incidents - officer involved shootings, use of force, and pursuits.
    - Managing the Internal Affairs function.
    - Police discipline.
    - Use of force and deadly force issues.
    - Police pursuit issues.
    - Investigative procedures and supervision.
    - Jail intake procedures
    - Personnel practices.

1



- Supervisory techniques.
- Liability management.
- Policy and procedure development.
- Management effectiveness.

I consult with police departments of 3 to 39,000 employees, performing internal audits for the police organization. My primary areas of focus during these audits are:

- Citizen complaint procedures.
- Discipline, internal affairs and early warning systems.
- Personnel practices including selection, hiring, EEOC/AA, promotion, assignment and retention.
- Specialized operations including traffic, investigations, narcotics, vice, intelligence, emergency response teams and unusual occurrence units.
- Organizational structure and command responsibilities.
- Police department governance.
- Policy and procedures development.
- Use of force policy and procedures.
- Investigation of critical incidents.

3. Since 1983, I have been retained in over 850 police related cases. This involvement has been on a mix of approximately 2/3 plaintiff and 1/3 defense. Assistance provided includes case analysis and development and expert witness testimony. I have been qualified in state and Federal courts, including the District of Columbia and Puerto Rico, to provide trial testimony in many areas including:

- Field procedures including tactics, arrest techniques and pursuits.
- Standards of police misconduct investigations.
- Use of force and deadly force.
- Supervision.
- Investigative procedures.
- Jail intake procedures
- Police management and personnel practices.
- Investigation of citizen complaints and discipline.
- Police policy and procedures development.
- Police training.

2

4.      I am a former Deputy Chief of Police of the Los Angeles Police Department. I served as a police officer in the Los Angeles Police Department for over twenty years until I retired in 1981. During that period of time I served as a patrol and traffic officer, supervisor, manager, command officer and executive staff officer. I was involved in police training, investigating allegations of police misconduct, Chairman of the Use of Force Review Board, member of the Unusual Occurrence Command Post Cadre, and researcher and author of the chapters on internal discipline, training and management/employee relations for the <u>Police Task Force Report</u> of the National Advisory Commission on Criminal Justice Standards and Goals. In 1993 I published the manual/guide <u>Law Enforcement Administrative Investigations</u>; the Second Edition in 1998; and, in 1996, "Creating Reasonable and Defensible Discipline," <u>CALEA Newsletter</u>.

5.      My experience, training and background is more fully described in the attached resume. A complete list of my testimony during the past four (4) years is attached.

6.      I have reviewed the following materials to date regarding this case:

- Complaint and other court documents
- Police reports including DWI reports and Incident Report
- Photographs of Plaintiff and interior of Old Saybrook Police Station
- Expert witness disclosure and report of Dr. Kanfer
- Medical records of Plaintiff
- Interrogatory Responses of Plaintiff and Defendants
- Other civil complaints (Gagne v. Town of Old Saybrook and Reynolds v. Hogfeldt, et al.)
- Department of Motor Vehicles documents

- Depositions of Karl Hogfeldt and Sgt. Donald Hull
- Miscellaneous newspaper articles

7. These opinions are based upon the totality my specialized knowledge in the field of police practices. This experience is derived from my personal police experience, knowledge and training. This expertise has been developed during my 42 years involvement in law enforcement at all various capacities as a practitioner and my continued experience as a trainer, auditor and litigation consultant. This experience has provided me with extensive personal and specialized training, experience and knowledge of police operations and generally accepted police practices. The body of knowledge that I have reviewed over the years coupled with my personal and professional experiences, my continued auditing of police agencies, my constant training of police supervisors, managers and executives, my continuous interaction with other police professionals, organizations and training personnel, all form the foundation for the opinions I am rendering in this matter.

There is a large body of knowledge and literature about the practices and standards which modern, reasonably managed and administered police agencies across the U.S. should follow and apply to its operations. These generally accepted practices have developed over time to encourage and assist police agencies to deliver police services to communities serviced which are professional, reasonable, effective and legal. Many of these generally accepted practices have been developed from law enforcement critical analysis of field incidents and examinations of incidents reported to cause police liability, deficiencies and employee misconduct. These generally accepted

practices have been a response to reported cases of police misconduct and liability and a desire by law enforcement to create a system to ensure that police conduct remains within acceptable legal and constitutional bounds. I am familiar with this body of knowledge and through my continuous training and audits assist law enforcement with this requirement for reasonable and legal police response to field incidents and for constant improvement.

My examination of the factors involved in this police practices incident embodies the basic fundamentals which I employ in my professional examination of police agencies during my audits and when working as a consultant with the U.S. Department of Justice. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision.

8. It is my understanding that the following events occurred culminating in this litigation: On October 22, 1999, approximately after midnight, Mr. Hogfeldt was stopped by Sgt. Hull for driving Sgt. Hull believed to be indicative of driving under the influence. He was accompanied by a male companion, Stephen White. Plaintiff Hogfeldt was arrested and transported to the Old Saybrook Police Station. He was eventually released at 0200 hours. Mr. Hogfeldt at 0805 hours was treated for multiple fractures of his face, arm and ribs.

9. This preliminary expert report will address the police practices issue of use of force.

10. **The use of force against Plaintiff Hogfeldt by members of the Town**

5

of Old Saybrook Police Department was objectively unreasonable and contrary to generally accepted police practices.

11.  Reasonable police officers are trained in the legal and operational aspects of use of force. Use of force training all must conform to the Supreme Court decisions and state law. This training has become national in scope. Model policies on use of force are promulgated by several national guidance bodies such as the International Association of Chiefs of Police. Police officers are provided with laws, models and subject control tactics to use. These are designed to be within the parameters of legal uses of force. They are also designed to protect not only the officer involved, but the subject upon whom force is used. Officers are restricted in the use of force to use only that force which is reasonable and necessary to overcome resistance, comply cooperation and effect an arrest (*Graham v. Conner*).

12.  This use of force training is usually complemented by the use of some form of use of force/control/subject resistance matrix, continuum or graphic. These are very similar in the basic content. They identify levels of subject resistance and types of officer reaction/response to this resistance. The graphics are designed to demonstrate visually to police officers, trainees and others viewing the document the reasonable relationship between what a subject being arrested/restrained does and the officer's response. Common to these graphics are subject levels of resistance such as verbal, passive, active, assaultive, aggressive and aggravated. Common descriptors used for officer response are presence, verbal, soft hand control, chemical agents, hard hand

control, transporters, intermediate, incapacitating and deadly force. I am aware that the training provided by the Connecticut Police Academy comports to these generally accepted practices.

13. Mr. Hogfeldt's arrest was a common field encounter for a municipal police officer. Intoxicated persons are expected to be difficult to communicate with and deal with during police processing. Nothing in what was described by the officers of the Town of Old Saybrook appeared to be unusual or unreasonable particularly when dealing with someone the police officers contend was intoxicated.

14. Sgt. Hull in his police report documented that Mr. Hogfeldt "...fell face first into the wall...did not fall to ground...then slipped to his knees...I noticed there was some blood dripping from Hogfeldt's face...he had a bloody nose." He was then held down by Sgt. Hull and Officers Perrotti and DeMarco.

15. In his deposition, Sgt. Hull denied that the Plaintiff was subjected to any "beating." He added to his police report testifying that Mr. Hogfeldt "slid right down onto his belly at this point." It was at this point that the other officers entered the interview room. Sgt. Hull acknowledged that he knew Mr. Hogfeldt's nose was injured, but not broken. He denied any knowledge of the other injuries. Sgt. Hull indicated that is the only injury he believed the Plaintiff could have received during his custody. He acknowledged that Mr. Hogfeldt had no obvious injuries before he was arrested.

16. Mr. Hogfeldt had a markedly different version of events during his deposition. He testified that another officer was in the room with Sgt. Hull. He believed it was Officer DeMarco who was also at the scene of his initial arrest. "I was grabbed

7

from behind, and my head was smashed against the wall until I was just knocked out." (pg. 55) He believed he must have been unconscious when his eye was injured and his arm and ribs were fractured. He testified that he was picked up at the police station by Mr. White and he stayed with him until they went to the hospital early that morning. He denied that he was injured in any way either before or after his encounter with the police.

17. Sgt. Hull testified that the video tape was not working properly and had not for several months. He further testified that he did not provide Mr. Hogfeldt any medical treatment other than he offered to get him an ice pack and ask whether he wanted medical attention.

18. Any reasonable police officer knows and is taught that they are responsible for the safety and well being of persons who are in their custody. The testimony of Sgt. Hull indicated that it was obvious that Mr. Hogfeldt had received an injury to his head. This type of injury is significant in police practices. These can have serious consequences. Unless a police officer is medically trained to the level of at least an Emergency Medical Technician, a reasonably trained police officer would not have the necessary training to make a reasonable decision on any medical necessity. There was no reason that Sgt. Hull should not have called for an immediate response by medical personnel to ensure that Mr. Hogfeldt was safe to release. There was no reason not to photograph Mr. Hogfeldt after he sustained the injury to support the Police Department's contention that his injury was "only a bloody nose."

19. There is a disparity between the versions of events between Mr. Hogfeldt

and Sgt. Hull. There is no documentation to support that the severe injuries suffered by Mr. Hogfeldt occurred either before or after his arrest and detention by Sgt. Hull and other members of the Old Saybrook Police Department. Injuries sustained by Mr. Hogfeldt would have been observable to any police officer had it occurred before the arrest. Sgt. Hull testified that he did not observe any injuries when he first encountered Mr. Hogfeldt. There were only 6 hours between the time he was released and when he was treated in the Emergency Hospital. There is no documentation which would support that he suffered injuries after he was released and between the time he was taken to the Emergency Room. Dr. Kanfer reported that the injuries suffered by the Plaintiff were more consistent with an assault than any fall to the floor. From the police reports and the depositions of both Sgt. Hull and Mr. Hogfeldt there would have been no lawful, legitimate reason for any officers to use the degree of force necessary to produce the injuries suffered by Plaintiff Hogfeldt.

20. It is my understanding that additional materials may be in process of being produced or may be requested later. I would request that this report be considered a preliminary report. Should any subsequent information be produced and materially affect or alter any of these opinions, I will either submit a supplemental response or be prepared to discuss them during any scheduled deposition.

21. At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool, I will assure that they are made available for review, if requested, prior to their use.

22. My fees for this professional service is a flat Case Development Fee of

9

$5000 and a fee of $1800 for a deposition in Rhode Island or $2000 per day plus expenses for services away from Rhode Island including depositions and trial appearances.

This report is signed under penalty of perjury on this 14th day of February, 2003, in Greenville, RI.

*Lou Reiter*

Lou Reiter